UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

DEARBORN BANCORP, INC.,

                    Debtor.

_____/

FRED J. DERY, TRUSTEE,

                    Plaintiff,

vs.

JEFFREY KARAFA,

                    Defendant.

_____/

FRED J. DERY, TRUSTEE,

                    Plaintiff,

vs.

MICHAEL J. ROSS,

                    Defendant.

_____/

Case No. 13-44665

Chapter 7

Judge Thomas J. Tucker

Adv. Pro. No. 13-5094

Adv. Pro. No. 13-5095

## TRIAL OPINION

## I.  Introduction

Each of the above-captioned adversary proceedings is a preference action arising out of

the Chapter 7 bankruptcy case of Dearborn Bancorp, Inc.  The Plaintiff Chapter 7 Trustee seeks

to avoid pre-petition transfers the Debtor made to Defendant Jeffrey Karafa totaling $130,422.00

(Adv. No. 13-5094) and pre-petition transfers the Debtor made to Defendant Michael Ross

totaling $228,344.00 (Adv. No. 13-5095). The Trustee seeks judgments for these amounts against the Defendants, plus interest. The Trustee also seeks disallowance, under 11 U.S.C. § 502(d), of each Defendant's claim filed in the Debtor's bankruptcy case.

The Court granted partial summary judgment for the Plaintiff Trustee in each of these cases, and then held a joint bench trial. The parties then filed post-trial briefs.

The trial focused on two of the statutory defenses to the avoidance of preferential transfers — namely, the "contemporaneous exchange for new value" defense under 11 U.S.C. § 547(c)(1), and the "subsequent new value" defense under 11 U.S.C. § 547(c)(4).

The Court has considered all of the arguments of the parties; all of the exhibits admitted into evidence at trial, namely Plaintiff's Exhibits 1-4 and 8-27, and Defendants' Exhibits C, D, F-1, F-2, G-1-D, G-4-A, G-4-B, I-1, I-2, J-3, K-2, L-2, L-3, O, and P, and each of the following Defendants' Exhibits for a limited purpose as stated during trial: J-1, M-1, M-2-A, M-3, M-4-B.[1] And the Court has considered all of the testimony that was admitted into evidence at trial, of the following witnesses: William Demmer, Defendant Michael Ross, and Defendant Jeffrey Karafa.

This opinion constitutes a statement of the Court's findings of fact and conclusions of law in these two adversary proceedings. For the reasons stated in this opinion, the Court will enter judgment in favor of the Plaintiff Trustee against each of the Defendants.

## II. Background and facts

### A. Background

The following quotation from Defendants' trial brief accurately states some basic

---

[1] In this opinion, citations to Plaintiff's trial exhibits will be in the form "PX-_" and citations to Defendants' trial exhibits will be in the form "DX-_".

background facts that are not disputed:

Prior to the filing of its bankruptcy petition, Dearborn Bancorp, Inc. ("Debtor") was a publicly traded company with approximately 5,000 shareholders and was listed on the NASDAQ Stock Exchange. Debtor owned 100% of the stock of Community Bank of Dearborn, which later became known as Fidelity Bank ("Bank").

Debtor employed Michael Ross ("Ross") as its President and Bank employed Ross as its President and Chief Executive Officer. Debtor employed Jeffery Karafa ("Karafa") as its Treasurer and Chief Operating Officer and Bank employed Karafa as its Senior Vice President, Chief Financial Officer, Secretary, and Treasurer. Ross and Karafa oversaw the day-to-day operations of Bank and Debtor.

On or about March 30, 2012: (a) Bank was closed by the Michigan Office Of Financial And Insurance Regulation; (b) the Federal Deposit Insurance Corporation ("FDIC") was appointed to be Bank's receiver; (c) substantially all of the assets of Bank were sold to Huntington National Bank; and (d) all of the employees of Bank were terminated.

On or about March 21, 2012, Debtor entered into Consulting Agreements with Ross and Karafa. . . . [Under] the Consulting Agreements, Debtor retained Ross and Karafa to perform services in connection with the winding up of Debtor's business and affairs. . . . The Consulting Agreement with Ross was effective as of March 31, 2012 and the Consulting Agreement with Karafa was effective as of March 30, 2012. [Under] the Consulting Agreement with Ross, Debtor was obligated to provide the following to Ross in exchange for his performance of duties under the Consulting Agreement: (I) compensation of $6,867 [per week] paid weekly in advance; (ii) an allowance for health care benefits of $1,000 [per month] paid monthly on the first of each month; and (iii) reimbursement of expenses of $75 [per month] paid monthly on the first of each month. [Under] the Consulting Agreement with Karafa, Debtor was obligated to provide the following to Karafa in exchange for his performance of duties under the Consulting Agreement: (I) compensation of $3,846 [per week] paid weekly in advance; (ii) an allowance for health care benefits of $1,000 [per month] paid monthly on the first of each

3

month; and (iii) reimbursement of expenses of $50 [per month] paid monthly on the first of each month.

Ross and Karafa performed the obligations required under their respective Consulting Agreements. Between April 7, 2012 and November 2, 2012, Debtor paid $228,344 to Ross and $130,422 to Karafa. Such payments were made in the amounts and at the times required under their respective Consulting Agreements. Both Ross and Karafa continued to perform services for Debtor pursuant to the provisions of the Consulting Agreements after Debtor ceased paying them for services at the beginning of November 2012.

Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on March 11, 2013. Ross filed a proof of claim, Claim No. 2, in the amount of $137,340 for services rendered pursuant to his Consulting Agreement subsequent to November 9, 2012. Karafa filed a proof of claim, Claim No. 5, in the amount of $76,920 for services rendered pursuant to his Consulting Agreement subsequent to November 9, 2012.[2]

## B. Plaintiff Trustee's complaints

The Plaintiff Trustee's complaints in these two adversary proceedings are similar, and each complaint contains six counts.[3] Count I of each complaint seeks to avoid the pre-petition transfers the Debtor made under the Consulting Agreements with Defendants — totaling $130,422.00 to Karafa and $228,344.00 to Ross — as preferential transfers under 11 U.S.C. § 547(b). Counts II through IV, which are no longer part of these cases, sought to avoid the same transfers, as fraudulent transfers under several provisions in 11 U.S.C. § 548. Count V seeks recovery of the avoided transfers from each Defendant, as an initial transferee, under 11 U.S.C.

_____

[2] Trial Br. of Michael J. Ross and Jefferey Karafa (Docket # 76 in Adv. No. 13-5094; Docket # 72 in Adv. No. 13-5095) at 1-4.

[3] Compl. (Docket # 1 in Adv. No. 13-5094); First Am. Compl. (Docket # 6 in Adv. No. 13-5095).

4

§ 550.  And Count VI seeks disallowance of each Defendant's claim filed in the bankruptcy case under 11 U.S.C. § 502(d).

## C.  The Court's summary judgment rulings and the trial

Before trial, Plaintiff moved for summary judgment in each adversary proceeding. Plaintiff sought summary judgment on Count I (the preference claim), and also on Counts III and IV (fraudulent transfer claims) of his complaint in each case.  Defendants opposed the summary judgment motions.

After holding a hearing, the Court issued a bench opinion[4] and entered an order in each adversary proceeding, granting Plaintiff's motions in part and denying them in part.  The Court denied Plaintiff's summary judgment motions entirely with respect to the fraudulent transfer claims (Counts III and IV).  But the Court granted partial summary judgment with respect to Plaintiff's preference claims in each adversary proceeding (Count I), as follows:

> IT IS ORDERED that:
>
> 1.  The Motion is granted to the following extent: Plaintiff is granted partial summary judgment on Count I . . ., determining that the Plaintiff has established all of the necessary elements under 11 U.S.C. § 547(b) for avoiding the transfers alleged and referred to in . . . the Complaint . . . .
>
> 2.  The Motion also is granted to the following extent: Plaintiff is granted partial summary judgment, with respect to the Defendant's affirmative defense to Count I under 11 U.S.C. § 547(c)(2).
>
> 3.  To the extent the Plaintiff's Motion seeks summary judgment on the Defendant's affirmative defenses to Count I under 11 U.S.C. § 547(c)(1) and 11 U.S.C. § 547(c)(4), the Motion is

---

[4]  A transcript of the Court's bench opinion is on file at Docket # 68 in Adv. No. 13-5094, and it is cited in this opinion as "Tr. of Summ. J. Bench Op. at __."

denied.[5]

The Court then held a joint trial in the two adversary proceedings.  Before trial, Plaintiff

abandoned all of his fraudulent transfer claims, Counts II through IV in each case,[6] and the Court

now will enter judgment dismissing those claims with prejudice.  Trial was held on Plaintiffs

preference claims under Count I, and the related claims that depend on Plaintiff's success in

avoiding the transfers as preferences — Counts V (the § 550 recovery claim), and VI (the

§ 502(d) claim).

## III.  Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C.

§§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.).  All of Plaintiff's

claims in these adversary proceedings are core proceedings, under 28 U.S.C. §§ 157(b)(2)(B),

157(b)(2)(F) and 157(b)(2)(H).

In addition, each of these adversary proceedings falls within the definition of a

proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within

the meaning of 28 U.S.C. § 1334(b).  Matters falling within either of these categories in

§ 1334(b) are deemed to be core proceedings.  *See Allard v. Coenen* (*In re Trans-Industries,*

*Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009).  Each is a proceeding "arising under title 11"

because it is "created or determined by a statutory provision of title 11," *see id.*, namely

Bankruptcy Code §§ 502(d), 547, 548, and 550.  And each is a proceeding "arising in" a case

---

[5]  Order Granting in Part, and Denying in Part, Plaintiff's Motion for Summary Judgment, [etc.]
(Docket # 65 in Adv. No. 13-5094; Docket # 63 in Adv. No. 13-5095).

[6]  *See* Final Pretrial Order (Docket # 71 in Adv. No. 13-5094; Docket # 67 in Adv. No. 13-5095)
at 3.

6

under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See Allard v. Coenen*, 419 B.R. at 27.

For these reasons, this Court has *statutory* authority, under 28 U.S.C. § 157(b)(1), to enter a final judgment on all of Plaintiff's claims. If and to the extent this Court might otherwise lack *constitutional* authority to enter a final judgment, under *Stern v. Marshall*, 131 S. Ct. 2594 (2011), such a problem does not exist in these cases. This is because all of the parties in these adversary proceedings have expressly, knowingly, and voluntarily consented to this bankruptcy court entering a final order or judgment, as permitted by 28 U.S.C. § 157(c)(2).[7] Given that consent, this bankruptcy court has both statutory and constitutional authority to enter a final judgment on Plantiff's claims. *See Ralph Roberts Realty, LLC v. Savoy (In re Ralph Roberts Realty*), 562 B.R. 144, 147-48 (Bankr. E.D. Mich. 2016) *(*discussing, among other cases, *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015)).

## IV. Discussion

### A. Count I – avoidance of preferential transfers under 11 U.S.C. § 547

#### 1. The transfers at issue

It is undisputed that during the time period from April 1, 2012 to November 2, 2012, the Debtor made 32 weekly transfers to each of the Defendants. All of the transfers were done by a check drawn on the Debtor's bank account at Fifth Third Bank. And all of the transfers were payments called for by the Consulting Agreement that each Defendant had made with the Debtor in March 2012. For each payment, Defendants would generate an invoice. Copies of all of the

---

[7] *See* Report of Parties' Rule 26(f) Conference (Docket # 10 in Adv. No. 13-5094) at 4, ¶ 3(g); Report of Parties' Rule 26(f) Conference (Docket # 12 in Adv. No. 13-5095) at 4, ¶ 3(g).

7

invoices and of all the checks that paid the invoices were admitted into evidence at trial as exhibits: PX-2 and DX-I-1 and DX-I-2.

The invoices and the payments followed the timing set out in each Defendant's Consulting Agreement. For example, the first invoice issued for Ross was dated March 31, 2012, addressed to the Debtor, for the following amounts: (1) $6,867.00 for "Consulting Services for the week of April 1-7, 2012;" plus (2) $1,000.00 for "Allowance for Health Care Benefits for the month of April 2012;" plus (3) $75.00 for "Cell Phone reimbursement for the month of April 2012." The total of this invoice was $7,942.00. The invoice was paid by Check Number 1005 from the Debtor payable to Ross, dated April 1, 2012, in the amount of $7,942.00.[8] And this payment is reflected in the Debtor's bank ledger, PX-1. The next invoice from Ross was dated April 9, 2012, and was for $6,867.00, for "Consulting Services for the week of April 8-14, 2012." That invoice was paid by the Debtor's Check Number 1010 dated April 9, 2012. This was followed by weekly invoices and checks, in a similar pattern. The invoice at the beginning of each month included a weekly salary payment of $6,867.00, the monthly $1,000.00 allowance for health care benefits, and the monthly $75.00 cell phone expense amount. The other weekly invoices would include only the weekly salary payment for the specified week. Karafa's invoices and check payments followed the same pattern and timing, in the amounts specified by Karafa's Consulting Agreement.

The following tables list information about all the transfers at issue, and are based on information gleaned from PX-1, PX-2, DX-I-1, and DX-I-2. First, the transfers to Ross:

---

[8] *See* PX-2, first page.

8

| | for time period: | invoice date: | check date: Michael J. Ross | PX-1 check date: | salary: | health care: | expense: (cell phone): |
|---|---|---|---|---|---|---|---|
| 1. | **April 2012** | March 31, 2012 | April 1, 2012 | | | $1,000 | $75 |
| | April 1-7 | | | | $6,867 | | |
| 2. | April 8-14 | April 9, 2012 | April 9, 2012 | | $6,867 | | |
| 3. | April 15-21 | April 16, 2012 | April 16, 2012 | | $6,867 | | |
| 4. | April 22-28 | April 23, 2012 | April 23, 2012 | | $6,867 | | |
| | | | | | | | |
| 5. | **May 2012** | April 30, 2012 | April 30, 2012 | | | $1,000 | $75 |
| | April 29-May 5 | | | | $6,867 | | |
| 6. | May 6-12 | May 7, 2012 | May 7, 2012 | | $6,867 | | |
| 7. | May 13-19 | May 11, 2012 | May 11, 2012 | | $6,867 | | |
| 8. | May 20-26 | May 17, 2012 | May 17, 2012 | | $6,867 | | |
| | | | | | | | |
| 9. | **June 2012** | May 25, 2012 | May 25, 2012 | | | $1,000 | $75 |
| | May 27-June 2 | | | | $6,867 | | |
| 10. | June 3-9 | June 1, 2012 | June 1, 2012 | | $6,867 | | |
| 11. | June 10-16 | June 8, 2012 | June 8, 2012 | | $6,867 | | |
| 12. | June 17-23 | June 15, 2012 | June 15, 2012 | | $6,867 | | |
| 13. | June 24-30 | June 22, 2012 | June 22, 2012 | | $6,867 | | |
| | | | | | | | |
| 14. | **July 2012** | June 29, 2012 | June 29, 2012 | | | $1,000 | $75 |
| | July 1-7 | | | | $6,867 | | |
| 15. | July 8-15 | July 7, 2012 | July 7, 2012 | | $6,867 | | |
| 16. | July 16-22 | July 12, 2012 | July13, 2012 | | $6,867 | | |
| 17. | July 23-30 | July 19, 2012 | July 19, 2012 | | $6,867 | | |
| | | | | | | | |
| 18. | **August 2012** | July 26, 2012 | July 26, 2012 | | | $1,000 | $75 |
| | July 29-Aug 4 | | | | $6,867 | | |
| 19. | August 5-11 | August 2, 2012 | August 3, 2012 | | $6,867 | | |
| 20. | August 12-18 | August 7, 2012 | August 7, 2012 | August 10, 2012 | $6,867 | | |
| 21. | August 19-25 | August 16, 2012 | August 16, 2012 | | $6,867 | | |
| | | | | | | | |
| | **September 2012** | | | | | | |
| 22. | Aug 26-Sept 1 | no invoice | August 24, 2012 | | $6,867 | | |
| 23. | Sept 2-9 | August 30, 2012 | August 31, 2012 | Sept 2, 2012 | $6,867 | $1,000 | $75 |
| 24. | Sept 9-16 | Sept 6, 2012 | Sept 7, 2012 | | $6,867 | | |
| 25. | Sept 17-23 | Sept 16, 2012 | Sept 14, 2012 | | $6,867 | | |
| 26. | Sept 24-30 | Sept 23, 2012 | Sept 23, 2012 | | $6,867 | | |
| | | | | | | | |
| 27. | **October 2012** | Sept 29, 2012 | Sept 30, 2012 | Oct 1, 2012 | | $1,000 | $75 |
| | Sept 30-Oct 6 | | | | $6,867 | | |
| 28. | Oct 7-13 | Oct 4, 2012 | Oct 5, 2012 | Oct 7, 2012 | $6,867 | | |
| 29. | Oct 14-20 | Oct 13, 2012 | Oct 13, 2012 | Oct 14, 2012 | $6,867 | | |
| 30. | Oct 21-27 | Oct 19, 2012 | Oct 18, 2012 | Oct 21, 2012 | $6,867 | | |
| | | | | | | | |
| 31. | **November 2012** | Oct 25, 2012 | Oct 26, 2012 | Oct 28, 2012 | | $1,000 | $75 |
| | Oct 28-Nov 3 | | | | $6,867 | | |
| 32. | Nov 4-10 | Nov 1, 2012 | Nov 2, 2012 | | $6,867 | | |
| | | | | | | | |
| | Totals: | | | | $219,744 | $8,000 | $600 |
| | Total all payts.: | | | | **$228,344** | | |

Second, the transfers to Karafa:

| | | **Jeffrey L. Karafa** | | | | | |
|---|---|---|---|---|---|---|---|
| | for time period: | invoice date: | check date: | PX-1 check date: | salary: | health care: | expense: |
| | | | | | | | (cell phone): |
| 1. | **April 2012** | March 31, 2012 | April 1, 2012 | | | $1,000 | $50 |
| | April 1-7 | | | | $3,846 | | |
| 2. | April 8-14 | April 9, 2012 | April 9, 2012 | | $3,846 | | |
| 3. | April 15-21 | April 16, 2012 | April 16, 2012 | | $3,846 | | |
| 4. | April 22-28 | April 23, 2012 | April 23, 2012 | April 12, 2012 | $3,846 | | |
| | | | | | | | |
| 5. | **May 2012** | April 30, 2012 | April 30, 2012 | | | $1,000 | $50 |
| | April 29-May 5 | | | | $3,846 | | |
| 6. | May 6-12 | May 7, 2012 | May 7, 2012 | | $3,846 | | |
| 7. | May 13-19 | May 11, 2012 | May 11, 2012 | | $3,846 | | |
| 8. | May 20-26 | May 17, 2012 | May 17, 2012 | | $3,846 | | |
| | | | | | | | |
| 9. | **June 2012** | May 25, 2012 | May 25, 2012 | | | $1,000 | $50 |
| | May 27-June 2 | | | | $3,846 | | |
| 10. | June 3-9 | June 1, 2012 | June 1, 2012 | | $3,846 | | |
| 11. | June 10-16 | June 8, 2012 | June 8, 2012 | | $3,846 | | |
| 12. | June 17-23 | June 15, 2012 | June 15, 2012 | | $3,846 | | |
| 13. | June 24-30 | June 22, 2012 | June 22, 2012 | | $3,846 | | |
| | | | | | | | |
| 14. | **July 2012** | June 29, 2012 | June 29, 2012 | | | $1,000 | $50 |
| | July 1-7 | | | | $3,846 | | |
| 15. | July 8-15 | July 7, 2012 | July 7, 2012 | | $3,846 | | |
| 16. | July 16-22 | July 12, 2012 | July13, 2012 | | $3,846 | | |
| 17. | July 23-30 | July 19, 2012 | July 19, 2012 | | $3,846 | | |
| | | | | | | | |
| 18. | **August 2012** | July 26, 2012 | July 26, 2012 | July 23, 2012 | | $1,000 | $50 |
| | July 29-Aug 4 | | | | $3,846 | | |
| 19. | August 5-11 | August 2, 2012 | August 3, 2012 | | $3,846 | | |
| 20. | August 12-18 | August 7, 2012 | August 7, 2012 | August 10, 2012 | $3,846 | | |
| 21. | August 19-25 | August 16, 2012 | August 16, 2012 | | $3,846 | | |
| | | | | | | | |
| | **September 2012** | | | | | | |
| 22. | Aug 26-Sept 1 | August 24, 2012 | August 24, 2012 | | $3,846 | | |
| 23. | Sept 2-9 | August 30, 2012 | August 31, 2012 | Sept 2, 2012 | $3,846 | $1,000 | $50 |
| 24. | Sept 9-16 | Sept 6, 2012 | Sept 7, 2012 | | $3,846 | | |
| 25. | Sept 17-23 | Sept 16, 2012 | Sept 14, 2012 | | $3,846 | | |
| 26. | Sept 24-30 | Sept 23, 2012 | Sept 23, 2012 | | $3,846 | | |
| | | | | | | | |
| 27. | **October 2012** | Sept 29, 2012 | Sept 30, 2012 | Oct 1, 2012 | | $1,000 | $50 |
| | Sept 30-Oct 6 | | | | $3,846 | | |
| 28. | Oct 7-13 | Oct 4, 2012 | Oct 5, 2012 | Oct 7, 2012 | $3,846 | | |
| 29. | Oct 14-20 | Oct 13, 2012 | Oct 13, 2012 | Oct 14, 2012 | $3,846 | | |
| 30. | Oct 21-27 | Oct 19, 2012 | Oct 18, 2012 | Oct 21, 2012 | $3,846 | | |
| | | | | | | | |
| 31. | **November 2012** | | | | | N/A | N/A |
| | Oct 28-Nov 3 | Oct 25, 2012 | Oct 26, 2012 | Oct 28, 2012 | $3,846 | | |
| 32. | Nov 4-10 | Nov 1, 2012 | Nov 2, 2012 | | $3,846 | | |
| | | | | | | | |
| | Totals: | | | | $123,072 | $7,000 | $350 |
| | Total all payts.: | | | | **$130,422** | | |

Some explanation of these tables is necessary.  For each Defendant, the table shows the

time period for which a particular invoice was issued, and the date of the check that paid each invoice. The amounts paid by the checks dated at the beginning of each month are broken out into the three components on two lines in the table (salary; health care; cell phone), but the check was in a single amount.

The date in the "check date" column is the date on the face of each check. This is not necessarily the date on which the Debtor's bank honored the check. For § 547(b) purposes, at least, a transfer by check is deemed to be "made" on the date the drawee bank actually honors the check by paying it. *See Barnhill v. Johnson*, 503 U.S. 393, 394-95, 400 (1992) ("a transfer made by check [is] deemed to occur . . . on the date the drawee bank honors it" by paying it, and "not before," such as when the transferee receives the check).[9] In this case, there was no evidence presented by the parties at trial showing specifically when each check to the Defendants was paid by the drawee bank.[10] Neither side has made an issue of this. At the summary judgment stage, for example, it was undisputed that the Defendants were insiders of the Debtor, and that the transfers at issue all were made within the applicable one-year preference period, and the Court so ruled in granting partial summary judgment for Plaintiff.[11] And for purposes of the Court's

---

[9] The rule is different for purposes of the Defendants' affirmative defense under 11 U.S.C. § 547(c)(4), the "subsequent new value" defense. For purposes of that defense, the transfer by check is deemed to be made on the date the check is delivered to the transferee. But in this case that does not matter. *See* discussion in Part IV.A.5 of this Opinion, at footnote 37.

[10] There was no testimony about this subject. And the trial exhibits do not contain this information. For example, Plaintiff's exhibits, PX-1 and PX-2, show only the date of the checks. The same is true for Defendants' exhibits, DX-I-1 and DX-I-2.

[11] It was undisputed that each of the Defendants was an "insider" of the Debtor when all of the transfers were made, as defined by 11 U.S.C. § 101(31)(B) (defining "insider" to include, in the case of a debtor that is a corporation, a director or officer of the corporation, or a "person in control of the debtor"). Defendants admitted that they were insiders, and the Court so ruled. (*See* Tr. of Summ. J. Bench Op. at 4, 19, 11; Joint Br. of [Defendants] in Opp'n to Trustee's Mots. for Summ. J. (Docket # 47 in Adv. No. 13-5094; Docket # 45 in Adv. No. 13-5095) at 14, 14 n.15 (conceding that "Ross and Karafa

ruling on the Defendants' defenses, discussed below, it is immaterial whether the checks were honored on the dates written on the face of the checks, or within a day or two later. The Court will assume that each check was paid by the Debtor's bank on, or within a day or two after, the date of the check. This is what one would normally expect, and the circumstances in this case do not suggest anything else.

There are two minor discrepancies in the evidence, as indicated by the tables above. First, each side's exhibits consisting of the invoices and check copies are missing the invoice and check copy for one weekly salary payment to Defendant Ross. That is the payment of $6,867.00 made by the check dated August 24, 2012, and it was the salary payment for the week of August 26 to September 1, 2012. (*See* the "no invoice" line for that week under the "invoice date" column in the table for Ross, above.)[12] But this payment to Ross is shown in the Debtor's ledger for this bank account, PX-1, Check Number 1062 dated August 24, 2012. So the Court includes this payment in the table for Ross, and includes this in the transfers the Court finds were made to Ross. By including this payment, the total of the transfers to Ross equals the $228,344.00 total the parties agree on.

A second minor discrepancy is that for both Ross and Karafa, a few of the check dates shown by the check copies in each side's exhibits are different from the check dates for those checks that are shown in the Debtor's account ledger, PX-1. These different dates in PX-1 are

---

were insiders within the meaning of Code Section 101(31)" and admitting that all the transfers at issue were made during the 1-year pre-petition period); *see also* PX-20; PX-21, each at response to Admission Request No. 6 (admissions by Ross and Karafa, each, that he "was a director, officer, or person in control of the Debtor throughout the period January 1, 2012 through the Petition Date"). Under § 547(b)(4), therefore, the applicable preference period is the one-year period preceding the March 11, 2013 bankruptcy petition date.

[12] *See* PX-2; DX-I-1; DX-I-2.

shown in the tables above in the "PX-1 check date:" column. The Court finds that the check

dates shown in the Debtor's account ledger, PX-1, are incorrect with respect to these checks,

because they do not match the actual dates written on the face of the check copies themselves.

The correct check dates, for all checks reflected in each table above, are the dates stated in the

"check date:" column.[13]

## 2. The elements for avoidance under § 547(b)

The Court reiterates and incorporates by reference into this opinion all of the rulings the

Court made on Plaintiff's summary judgment motions. Thus, Plaintiff is deemed to have

established, as to all of the transfers at issue, each of the elements for avoidance of the transfers

under 11 U.S.C. § 547(b). Section 547(b) states the elements:

> (b) Except as provided in subsection (c) and (I) of this
> section, the trustee may avoid any transfer of an interest of the
> debtor in property—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by
> the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
> (A) on or within 90 days before the date of the filing of
> the petition; or

---

[13] In reviewing these exhibits, the Court initially wondered whether the check dates stated in the "Date" column of the Debtor's account ledger, PX-1, were actually the dates on which the Debtor's bank paid the checks. But there is no evidence that this is so. And the Court finds that this is not the case, based on the fact that two of the check dates in the account ledger *predate* the date that is on the face of the check copy for that check. *See* the dates in the Karafa table above, in the "PX-1 check date" column, for April 12, 2012 and July 23, 2012. The actual dates on the copies of those checks are April 23, 2012 and July 26, 2012, respectively.

> (B) between ninety days and one year before the date of
> the filing of the petition, if such creditor at the time of such
> transfer was an insider; and
>
> (5) that enables such creditor to receive more than
> such creditor would receive if—
>
>> (A) the case were a case under chapter 7 of this title;
>>
>> (B) the transfer had not been made; and
>>
>> (C) such creditor received payment of such debt
>> to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

At the summary judgment stage, Defendants did not dispute any of the § 547(b) elements with respect to any of the transfers at issue, except one — the "antecedent debt" element in § 547(b)(2).[14] Defendants argued that the transfers at issue were not "for or on account of an antecedent debt owed by the debtor before such transfer was made" within the meaning of § 547(b)(2). In granting partial summary judgment for Plaintiff on this element, the Court rejected Defendants' argument, and the Court reiterates that ruling now. In its summary judgment bench opinion, the Court stated:

> With respect to the [§] 547(b)(2) antecedent debt element, . . . the [D]efendants argue that this element is not established with respect to the transfers at issue, the payments made to [D]efendants by the [D]ebtor under these consulting agreements because the payments . . . were not due under the terms of those consulting agreements before they were made by the [D]ebtor. The [D]efendants' concept . . . of antecedent debt . . . is that a debt is not incurred by a debtor until the debt is due to be paid — [until] payment is due. The [P]laintiff on the other hand argues that the [D]ebtor incurred a debt under each of the consulting agreement[s], . . . when those agreements were made; that is, when each agreement was signed on March 21, 2012, even though the payments later made by the

---

[14] *See* Tr. of Summ. J. Bench Op. at 11.

14

[D]ebtor to each of the [D]efendants . . . were not due under the terms of those agreements to be paid until a later date.

The Court has reviewed carefully the cases cited by each of the parties on this issue of antecedent debt, and the Court agrees with the reasoning and holding of the bankruptcy court in the *Enron* case relied heavily upon by the Plaintiff Trustee with respect to this antecedent debt issue. The *Enron* case is the *Official Committee [of Unsecured Creditors of Enron Corp., v. Whalen* (*In re Enron Corp.*)], 357 B.R. 32[, 38-49 (Bankr. S.D.N.Y. 2006)]. I also agree with the cases discussed and cited by the *Enron* court that are consistent with the *Enron* court's holding and reasoning . . . .

The Court therefore holds that a debtor's debt is incurred and arises for Section 547(b)(2) purposes as soon as the debt exists, even [if] at that time it is still a contingent or unmatured debt, and therefore the debt is not yet due to be paid. And I agree in particular with the *Enron* court's reasoning expressed at 357 B.R. [at 47-48] . . . .

The consequence of this is that . . . payments made on that debt at a later time are and must be deemed to be payment of an antecedent debt . . . .

Applying these concepts to this case, in this case the [D]ebtor's debt to each of the [D]efendants under their respective consulting agreements was incurred and arose and existed as soon as the [D]ebtor and each [Defendant] signed their respective consulting agreements, and in the case of each of these agreements that date was March 21, 2012 and that's not disputed. . . . This is so even though the payments due to the [D]efendants under these agreements did not become due until later dates. For example . . ., as [D]efendants point out, the payment of their salary amounts were to be paid under these agreements . . . weekly in advance. The . . . [D]ebtor's debt . . . under these consulting agreements existed . . . as of March 21, 2012 even though as of that date it may have been contingent upon later performance of their duties under the agreement by the [D]efendants, and even though the debt did not mature or become due to be paid until later.

It follows, therefore, that all of the payments made . . . by the [D]ebtor to each of the [D]efendants under the consulting agreements, were . . . transfers . . . "for on account of an antecedent debt owed by the [D]ebtor before such transfer was made," within the meaning of Section 547(b)(2) of the Bankruptcy Code. The

15

Court finds that there is no genuine dispute of fact about this and that Plaintiff Trustee is entitled to such a finding as a matter of law.[15]

### 3. Defendants' "ordinary course of business" defense under § 547(c)(2)

In opposing Plaintiff's summary judgment motion, Defendants argued that the transfers are not avoidable based on the affirmative defense under § 547(c)(2).[16] That subsection provides:

> (c) The trustee may not avoid under this section a transfer—
>
> . . .
>
> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>
> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>
> (B) made according to ordinary business terms[.]

11 U.S.C. § 547(c)(2). The Court granted summary judgment for Plaintiff on this defense. The Court reiterates that ruling now. In its summary judgment bench opinion, the Court stated:

> I agree with and find instructive . . . [the case of *TSIC, Inc. v. Thalheimer*, (*In re TSIC, Inc.*), 428 B.R. 103, 116 (Bankr. D. Del. 2010)]. . . . In discussing the ordinary course of business defense, the court made the following points[:] . . . . . "[Section 547(c)(2)'s] purpose is to leave undisturbed *normal financial relations* between a debtor and its creditors, even as a company approaches bankruptcy. . . . The term 'ordinary course of business' protects 'recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee.' . . . Courts hold that when a debtor transfers funds for the sole benefit of an insider, the transfer is not considered in the ordinary course of business." [*Id.* (italics in original) (citations omitted)].

---

[15] Tr. of Summ. J. Bench Op. at 12-15.

[16] Defendants have the burden of proving any defense under § 547(c). 11 U.S.C. § 547(g).

16

A little later on the same page the *TSIC* court finds that the defendant's severance payment in that case . . . did not have the benefit of the ordinary course of business defense in part because . . . "Thalheimer's severance was a transfer made to an insider at a time when the Debtor suffered from severe financial distress, therefore making the payment extraordinary and avoidable." . . .

[B]ased on the facts established by the evidence in the record about which there is no genuine dispute, the Court finds that the transfers at issue in each of these adversary proceedings to the [D]efendants under the consulting agreements were not in any part . . . in the words of [§] 547(c)(2), . . . "payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee." . . .

The . . . relevant facts . . . include the following, and most or all of these facts are established and admitted by each of the [D]efendants in their affidavits that were filed as exhibits . . . opposing the Trustee's summary judgment motion. The affidavits . . . are filed as attachments to Docket Number 47 in case number 13-5094 and Docket Number 45 in case number 13-5095.[17] And th[e] paragraph[s] in the affidavits that establish these facts include in the Karafa affidavit, Paragraphs 1, 2, 9, 10, 11, 13, 16 [. . . and 25]. And then the Ross affidavit, Paragraphs 1, 2, 11, 12, 13, 18, 19, 22, 23[.]

The facts include the following:

. . . The debts [incurred under the consulting agreements, which were . . . signed by the parties on March 21, 2012] were incurred by the [D]ebtor to two of the [D]ebtor's insiders. There's no dispute about that. Mr. Ross was the president of the [D]ebtor. Mr. Karafa was the treasurer, [and] chief operating officer of the [D]ebtor at the time. There is no dispute . . . that the [D]efendants were insiders of the [D]ebtor.

The debts were incurred by the [D]ebtor at a time when what was by far the [D]ebtor's primary asset and business[,] its subsidiary bank, Fidelity Bank, had been, . . . "in a distressed financial condition" . . . for approximately four years between 2008 and

---

[17]   These affidavits of Ross and Karafa also were admitted into evidence at trial, as PX-26 and PX-27.

2012. That's according to the Ross and Karafa affidavits and I'm quoting from them. And as of March 19, 2012 Fidelity Bank . . . "was in imminent danger of closing and receivership by the FDIC[.]" . . .

The consulting agreements . . . were made . . . at a time when the [D]ebtor, the [D]ebtor's board of directors, and the [D]efendants all expected that the bank, Fidelity Bank, would shortly be closed, which of course it's undisputed the bank was closed [and] taken over on March 30, 2012. That is a takeover which Mr. Ross in Paragraph 22 of his affidavit describes as the long anticipated FDIC takeover of the bank.

When the consulting agreements were made, their purpose, as was clear to all the parties involved, was to keep the [D]efendants working for the [D]ebtor for . . . "for winding down of the [D]ebtor's business operations and to help the [D]ebtor deal with various operating and winding down issues."

When the consulting agreements were made the [D]ebtor and the [D]efendants all contemplated that the [D]ebtor would file bankruptcy. That is established . . . [by] Paragraph 23 of the Karafa affidavit.

Given all of these facts admitted by the [D]efendants, it is clear that the [§] 547(c)(2) defense cannot be proven by the [D]efendants; rather, that defense is negated and entirely without merit beyond any genuine dispute of material fact because the [D]ebtor's debt that was paid by the transfers sought to be avoided by Trustee was not debt incurred by the [D]ebtor in the ordinary course of business or financial affairs of the [D]ebtor and the transferees. Therefore, the Plaintiff Trustee is entitled to partial summary judgment in Plaintiff's favor on the [D]efendants' [§] 547(c)(2) ordinary course of business defense . . . .[18]

### 4. Defendants' § 547(c)(1) defense (contemporaneous exchange for new value)

#### (a) Elements of the defense

At trial, Defendants bore the burden of proving, by a preponderance of the evidence, that the transfers were not avoidable based on their remaining defenses under § 547(c), namely,

---

[18] Tr. of Summ. J. Bench Op. at 17-20.

18

§§ 547(c)(1) and 547(c)(4).  *See* 11 U.S.C. § 547(g).

Section 547(c)(1) states:

> (c) The trustee may not avoid under this section a transfer—
>
> > (1) to the extent that such transfer was—
> >
> > > (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
> > >
> > > (B) in fact a substantially contemporaneous exchange[.]

11 U.S.C. § 547(c)(1).  Defendants contend that all of the transfers satisfy the elements of this defense.

First, Defendants argue that the text of their Consulting Agreements with the Debtor shows that the Debtor and the Defendants "intended" for each of the 32 payments that the Debtor made to the each of the Defendants to be a "contemporanous exchange" for "new value given to the [D]ebtor," within the meaning of § 547(c)(1)(A).

Second, Defendants argue that each of the 32 payments they each received from the Debtor was "in fact a substantially contemporaneous exchange" for "new value" that Defendants gave to the Debtor, in the form of services they performed under the Consulting Agreements, within the meaning of § 547(c)(1)(B).

The elements that a creditor must prove under § 547(c)(1) include the following:

> The contemporaneous exchange exception under section 547(c)(1), thus, has three elements (1) both the debtor and creditor must intend the transfer to be a contemporaneous exchange; (2) the exchange must, in fact, be contemporaneous; and (3) the exchange must be for a new value.

*See Stevenson v. Leisure Guide of Am., Inc.*, (*In re Shelton Harrison Chevrolet, Inc.*), 202 F.3d

834, 837 (6th Cir. 2000) (citation omitted).

The second of these elements — actual contemporaneousness — requires "that there must be 'temporal proximity between the [new value] and the [debtor's] transfer . . . .'" *McLemore v. Third Nat'l Bank in Nashville*, (*In re Montgomery*), 123 B.R. 801, 812 (Bankr. M.D. Tenn. 1991), *aff'd*, 136 B.R. 727, *aff'd*, 983 F.2d 1389 (6th Cir. 1993) (quoting *Ray v. Sec. Mut. Fin. Corp.* (*In re Arnett*), 731 F.2d 358, 364 (6th Cir. 1984)).

When the "new value" alleged by the creditor is from services, the alleged "new value" is deemed to have been given on the date(s) the services were performed. *Webster v. Harris Corp.* (*In re NETtel Corp., Inc.*), 319 B.R. 290, 295 (Bankr. D.D.C. 2004); *Excel Enters., Inc. v. Sikes, Gardes & Co.* (*In re Excel Enters., Inc.*), 83 B.R. 427, 431 (Bankr. W.D. La. 1988).

**(b) The meaning of "new value"**

The "new value" that the Defendants say they gave to the Debtor was in the form of the services they performed under their Consulting Agreements. The phrase "new value," as used in § 547, is defined in § 547(a)(2). Under that definition, "services" alone are not "new value." But "money's worth in . . . services" can be "new value." Section 547(a)(2) states:

> (a) In this section –
> . . .
>
> (2) **"new value" means** money or **money's worth in** goods, **services**, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation[.]

11 U.S.C. § 547(a)(2) (emphasis added).

Under the "money's worth" wording of this definition, therefore, it is clear that services

must have monetary value in order to be "new value." And in its summary judgment decision, this Court made a more detailed ruling about what "new value" means under the § 547(a)(2) definition. In doing so, this Court borrowed, in part, from its earlier decisions discussing the concept of "value" as that term is defined in Bankruptcy Code § 548, the fraudulent transfer statute. *See* 11 U.S.C. § 548(d)(2)(A).[19]

The Court ruled as follows, and now reiterates its ruling:

> Among other things Plaintiff Trustee argues that . . . in order to be . . . considered value[] under [§] 547(c)(1) and [§] 547(c)(4) . . . **there must have been a direct or indirect economic benefit to the [D]ebtor viewed from the perspective of the [D]ebtor's creditors.** I discuss this concept and the applicable Sixth Circuit case law on this concept of value in [the following cases, and I incorporate by reference that discussion here]. [The following cases] discuss the concept of value in the context of "reasonably equivalent value" as that phrase is used in [§] 548(a)(1)(B). Th[e] cases are [*Gold v. Marquette University* (*In re Leonard*), 454 B.R. 444, 455-59 (Bankr. E.D. Mich. 2011); *Franklin Advisors, LLC v. Sherwood Management Corp.* (*In re: Whyco Finishing Technology, LLC*), 500 B.R. 517, 531-33 (Bankr. E.D. Mich. 2011); and *Lisle v. John Wiley & Sons, Inc.* (*In re Wilkinson*), 196 Fed. App'x. 337, No. 05-5744, 2006 WL 2380887 (6th Cir. Aug. 17, 2006).]
>
> **The concept or the types of direct or indirect value to the [D]ebtor that in my view are cognizable and can be recognized**

---

[19] *See Gold v. Marquette Univ.* (*In re Leonard*), 454 B.R. 444, 455 (Bankr. E.D. Mich. 2011):

> The Bankruptcy Code does not define the phrase "reasonably equivalent value." But the Code defines "value," for purposes of § 548, as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but [it] does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A).

An important difference between the § 548 definition of "value," on the one hand, and the § 547 definition of "new value," on the other hand, of course, is that in the latter definition, "new value" does *not* include satisfaction of an antecedent debt.

**as value . . . under these [§] 547(c) defenses, include the provision by the [D]efendants of work or services that did any of the following: [(1)] brought in money to the [D]ebtor or the [D]ebtor's bankruptcy estate; . . . [(2)] saved the [D]ebtor or the bankruptcy estate expense; or [(3)] reduced or eliminated or avoided liability for, or [reduced] liability for the [D]ebtor []or the bankruptcy estate.**

**The Court concludes that on the present record, and viewing the evidence in the light most favorable to the [D]efendants as I must do in ruling on these summary judgment motions, there are genuine issues of material fact that exist that preclude summary judgment for the Plaintiff Trustee on the [D]efendants' [§§] 547(c)(1) and 547(c)(4) defenses, including the issue of whether the [D]efendants' services performed under the consulting agreement[s] gave value and gave new value to the [D]ebtor, and if so, how much is the value of such value and new value.**[20]

See also *Phoenix Rest. Grp., Inc. v. Fuller, Fuller & Assocs., P.A.* (*In re Phoenix Rest. Grp., Inc.*), 316 B.R. 671, 679-80 (Bankr. M.D. Tenn. 2004) (citations omitted) ("'A vast majority of courts agree that 'new value' for purposes of § 547 must be something of tangible economic value.'" This view is in keeping with the purpose new value serves: replenishing the estate.").

**(c) Defendants' burden to quantify the value of the "new value" they gave**

With respect to the third element stated in *Stevenson*, that "the exchange must be for a new value," each Defendant argues that the *amount* of the value he gave in exchange for a substantially contemporaneous transfer to him is not relevant. For example, Defendants argue, there is no requirement that the new value be at least equivalent or reasonably equivalent in value to the amount of the transfer. Defendants argue that the Court need not measure or determine the *amount* of value provided by any given services they performed, as long as the services provided value of *any* amount to the Debtor.

---

[20] Tr. of Summ. J. Bench Op. at 22-23 (emphasis added).

Defendants make this argument only with respect to their contemporaneous new value defense under § 547(c)(1). Defendants explicitly disclaim any such argument under their § 547(c)(4) subsequent new value defense, which the Court discusses in Part IV.A.5 of this opinion, below.[21]

To illustrate Defendants' argument, consider as an example one of the transfers made by the Debtor to Defendant Michael Ross: the payment made by the Debtor to Ross by the check dated April 9, 2012 in the amount of $6,867.00, which was payment of Ross's weekly salary under his Consulting Agreement with the Debtor for the week of April 8-14, 2012. (*See* the first table in Part IV.A.1 of this opinion.) Under Defendants' argument, Ross does not need to prove that he performed services during the week of April 8-14, 2012 of a value which equaled or approximated at least $6,867.00. Rather, Defendants say, it is enough for Ross to prove that during that week he performed some services for the Debtor under his Consulting Agreement, which had economic value to the Debtor of *any* amount, however small. If Ross proves that much, Defendants argue, he has demonstrated that he gave the Debtor "new value" that week, sufficient to support a complete defense to avoidance of any of the $6,867.00 transfer he received for that week. So even if the value of Ross's services for that week was only $100.00, he argues that he has a complete defense to avoidance of the entire $6,867.00 transfer made to him for that week, under § 547(c)(1).

In support of their argument that the *amount* of the new value given is not important, for § 547(c)(1) purposes, Defendants cite two cases from 30 years ago, each decided by the United

---

[21] *See, e.g.,* [Defs.'] Resp. to Trustee's Mot. in Limine (Docket # 82 in Adv. No. 13-5094; Docket # 78 in Adv. No. 13-5095) at 4 ("[I]n the context of § 547(c)(4), . . . the defense is specifically limited to the extent of the new value provided subsequent to the transfers at issue. As such, Ross and Karafa agree that the value of the new value is properly an issue on their § 547(c)(4) defense. . . .")

States Court of Appeals for the Tenth Circuit: *Kenan v. Fort Worth Pipe Co.* (*In re George Rodman, Inc.*), 792 F.2d 125 (10th Cir. 1986); and *Spears v. Mich. Nat'l Bank* (*In re J.D. Allen*), 888 F.2d 1299 (10th Cir. 1989).

In *Kenan*, the debtor's business was drilling oil and gas wells. The defendant creditor had supplied materials to the debtor, and was owed $238,842 for materials supplied to the debtor for use on a particular well. The creditor had a valid materialmen's lien on that well. "The well was expected to produce oil and gas, and the debtor was able to obtain a loan on the condition that the lien on the well be released." 792 F.2d at 126. Within the 90-day preference period, the debtor paid the creditor the amount owed on the well, and in exchange the creditor released its lien on the well. *Id.*

After the debtor filed bankruptcy, the Chapter 7 trustee sued the creditor, seeking to avoid the debtor's payment as a preference under § 547(b). The creditor argued that it had a complete defense to avoidance under § 547(c)(1), because the creditor had provided new value in the form of the lien release in exchange for the debtor's payment. At trial, the parties agreed that at the time of the transfer and lien release, the well may have had some value, but that at the time of trial the well had been plugged and had no value. *See id.* The bankruptcy court rejected the creditor's defense. The bankruptcy court found that the creditor did not provide "new value" to the debtor when the creditor released its lien, because viewing the value of the well retroactively at the time of trial, the well had no value. *See id*.

On appeal, the Tenth Circuit Court of Appeals reversed the bankruptcy court, and held that the creditor had a complete defense under § 547(c)(1). The court relied on a different part of the statutory definition of "new value" than the part involved in this case. The court held that the

creditor's release of its lien on the debtor's well was "new value" given to the debtor under the

§ 547(a)(2) definition, because it was a "release by a transferee of property of previously

transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the

trustee under any applicable law." *See id*. at 127-28; 11 U.S.C. § 547(a)(2) (quoted in full

above). The court held that the creditor's release of its lien satisfied the literal requirements of

that part of the definition, reasoning:

> [T]here was a release by a transferee (appellant [creditor]) of
> property (the lien) previously transferred to such transferee. No
> evidence has been presented that the transaction is void or voidable
> by the debtor or the trustee under any applicable law. The
> exchange, therefore, satisfies the literal requirements of the
> definition of "new value."

*Id*. (footnotes omitted).

The *Kenan* Court then held, at least with respect to the part of the § 547(a)(2) definition

of "new value" at issue in that case, that it was not necessary to make a valuation of the lien

released by the creditor in exchange for the debtor's transfer. The court held that "[t]he plain

language of the definition does not require the valuation of the property transferred" and that "the

value of the exchange is not a consideration for purposes of § 547(c)(1)." *Id*. at 128. The court

contrasted § 547(c)(1) in this regard with the Bankruptcy Code's fraudulent transfer provision,

now found in 11 U.S.C. § 548(a)(1)(B)(I), which, in part, provides for the avoidance of a transfer

if the debtor "received less than a reasonably equivalent value in exchange for such transfer[.]"

*See id*.

Three years after *Kenan*, the Tenth Circuit followed the *Kenan* case, in the case of *Spears*

*v Mich. Nat'l Bank* (*In re J.D. Allen*), 888 F.2d 1299 (10th Cir. 1989). In that case, the debtor

had borrowed money from the defendant bank, secured by a security interest in the debtor's

contract rights under a contract described as a "Purchase and Escrow Agreement." The court

held that this was a security interest in a general intangible, and that it had been properly

perfected by the bank. *Id*. at 1302. Three months after giving the security interest, the debtor

transferred to the bank all of his rights under his contract, in exchange for payment of $75,000

from the bank. *Id*. at 1301. The bankruptcy trustee later sued the bank to avoid this transfer of

the debtor's contract rights, as a preference. The bankruptcy court granted summary judgment

for the bank, which the district court and the court of appeals affirmed. *Id*.

In *Spears*, the appeals court ruled that the debtor's transfer to the bank was entirely

protected from avoidance under the contemporaneous exchange defense in § 547(c)(1), because

the bank's $75,000 payment to the debtor was made at the same time the debtor transferred his

contract to the bank, and in exchange for that transfer. *Id*. at 1302-03. The court held this

without considering how the bank's $75,000 payment (the new value) compared to the value of

the contract rights the debtor transferred. The court cited and followed the *Kenan* case, noting

that in *Kenan*, "this court held that the 'new value' requirement under the Bankruptcy Code

should be construed liberally and that the valuation of the transfer is not a consideration." *Id*. at

1302.

The *Kenan* and *Spears* cases support Defendants' position. But as Plaintiff correctly

points out, these Tenth Circuit cases have since been undermined by later decisions of the Tenth

Circuit, and Defendants' position has been rejected by the courts of appeal in five of the other

federal circuits, and by lower court decisions. In fact, it appears that every reported case to

consider the issue after *Kenan* and *Spears* has rejected Defendants' position. (The Sixth Circuit

Court of Appeals has not ruled on the issue). The court of appeals cases rejecting Defendants'

26

position, grouped by circuit, include the following:

**Ninth Circuit:**

• *Sulmeyer v. Suzuki* (*In re Grand Chevrolet, Inc.*), 25 F.3d 728, 733-34 (9th Cir 1994), *as amended on denial of reh'g* (June 24, 1994):

> • This case cited and followed an earlier Ninth Circuit case, *Milchem, Inc. v. Fredman* (*In re Nucorp Energy, Inc.*); 902 F.2d 729, 733 (9th Cir. 1990) ("[A] court must measure the value given to the creditor and the new value given to the debtor in determining the extent to which the trustee may avoid a contemporaneous exchange.") *Id.* at 733 (internal quotation marks omitted).

> • The court further held that "[t]he extent to which the [debtor's] transfers will be shielded by the contemporaneous exchange exception will depend on" what value the trial court attaches to the alleged value given by the creditor. *Id.* at 734.

**Eleventh Circuit:**

• *Jet Florida, Inc. v. American Airlines, Inc.* (*In re Jet Florida Systems, Inc.*), 861 F.2d 1555, 1558-59 (11th Cir. 1988):

> • In *Jet Florida*, the preference defendant, in alleging a defense under § 547(c)(1), made the same type of argument Defendants make in this case. As the *Jet Florida* court described it, "rather than offer evidence of the value of the new credit extended or the services rendered to [the debtor], [the defendant] proffered the novel theory that it need only show that some new value was intended." 861 F.2d at 1558. In rejecting this argument, the court of appeals held:

>> Construing the whole of section 547, however, we conclude that
>> Congress was clear in requiring that a party seeking the shelter of

section 547(c)(1) must prove the specific measure of the new value given to the debtor in the exchange.

Section 547(c)(1) protects transfers only "to the extent" the transfer was a contemporaneous exchange for new value. A court must measure the value given to the creditor and the new value given to the debtor in determining the extent to which the trustee may void a contemporaneous exchange. This provision indicates that a creditor seeking the protection of section 547(c)(1) must prove with specificity the new value given to the debtor.

Furthermore, the applicable statutory definition of "new value" that Congress provided in section 547(a)(2) expressly requires that the creditor prove the specific valuation of the "new value." The relevant language for the purpose of deciding this case is the section's definition of "new value" as "money or money's worth in goods, services, or new credit." This language necessarily requires a specific dollar valuation of the "new value" — the "money's worth" — that the debtor received in the exchange.
. . .

Thus, we conclude that a creditor must, as a part of its section 547(c)(1) affirmative defense, prove the specific valuation of the "money or money's worth in goods, services, or new credit" that the debtor received as "new value" in the contemporaneous exchange.

861 F.2d at 1558-59 (footnotes omitted); *see also Official Unsecured Creditors' Comm. v. Airport Aviation Servs., Inc.* (*In re Arrow Air, Inc.*), 940 F.2d 1463, 1466 (11th Cir. 1991) (citing *Jet Florida*, 861 F.2d at 1558-59) (["A] party seeking to shelter a payment under the contemporaneous-exchange-for-new-value exception must do more than simply show that some new value was given the debtor; a party relying on the protection provided by this section must prove with specificity the measure of new value given the debtor in the exchange transaction he seeks to protect-and the challenged payment is protected only to the extent of the specific measure of new value shown.").

28

**Third Circuit:**

• *Creditors' Comm. v. Spada* (*In re Spada*), 903 F.2d 971, 975-77 (3d Cir. 1990):

>  • This case agreed with *Jet Florida*, and held:

>> Apparently the bankruptcy court concluded that once the creditor demonstrates that new value of any amount was conveyed to the debtor the entire transfer falls within the section 547(c)(1) exception to the preferential transfer rule. This implicit conclusion is contrary to both the language of the statute and the policy behind the preferential transfer rule. The plain language of section 547(c)(1) expressly states that a trustee is unable to avoid a transfer "*to the extent* that such transfer was intended ... to be a contemporaneous exchange for new value given to the debtor." (Emphasis added).
>> . . .

>> We have examined the plain meaning of sections 547(c)(1) and 547(a)(2) in the context of the Bankruptcy Code as a whole and conclude that a determination of how much "new value" was involved in the exchange is mandated.

> 903 F.2d at 975-76 (italics in original).

>  • After describing the reasoning and holding in the *Jet Florida* case and agreeing with it, the *Spada* court discussed the Tenth Circuit's decision in *Kenan* (also known as *In re George Rodman, Inc.*), disagreed with it, and noted that the Tenth Circuit had abandoned its decision in *Kenan*:

>> We agree with this reasoning [in *Jet Florida*] in its entirety. We are aware that the Court of Appeals for the Tenth Circuit appeared to reject this position in *In re George Rodman, Inc.*, 792 F.2d 125, 128 (10th Cir.1986) . . .; however, that court has subsequently abandoned that position, distinguished *In re George Rodman* on the facts, and followed *Jet Florida. In re Robinson Bros. Drilling, Inc.*, 877 F.2d 32, 33-34 (10th Cir.1989)[.]

> 903 F.2d at 977 (citation omitted); *see also Reigel v. Mahajan* (*In re Kumar Bavishi & Assocs.*), 906 F.2d 942, 949-50 (3d Cir. 1990) (same).

**Fifth Circuit:**

• *Southmark Corp. v. Schulte Roth & Zabel* (*In re Southmark Corp.*), 239 F.3d 365, 2000 WL 1741550, at *3 (5th Cir. Nov. 7, 2000), *as amended on reh'g* (Dec. 11, 2000) (unpublished table decision) (citing *Spada* and *Jet Florida*):

> • In this case, the Fifth Circuit held that "because [under § 547(c)(1)] the avoidable transfer is set off only to the extent that new value is given, the creditor is required to demonstrate the 'specific measure' of the new value received by the debtor."

> • The court also quoted the Fifth Circuit's earlier decision in *Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc.* (*In re Fuel Oil Supply & Terminaling, Inc.*), 837 F.2d 224, 228 (5th Cir. 1988) (quoting *A.I. Credit Corp. v. Drabkin* (*In re Auto-Train Corp.*), 49 B.R. 605, 612 (Bankr. D.C. 1985) for the proposition that "[t]he defense under § 547(c)(1) 'is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of other creditors.'" *Southmark,* 2000 WL 1741550, at *3 n.1 (internal quotation marks omitted).

**Fourth Circuit:**

• *Campbell v. The Hanover Ins. Co.* (*In re ESA Envtl. Specialists, Inc.*), 709 F.3d 388, 398-99 (4th Cir. 2013) (internal quotation marks and citations omitted):

> • In this case the Fourth Circuit held that "the party asserting the new value defense" under § 547(c)(1) "must prove with specificity the new value given to the debtor" and, in order to have a complete defense, must prove "with specificity" that the value given by the creditor in exchange for the debtor's transfer "had a value at least as great as the amount of the alleged preferential transfer[.]")

30

• The *Campbell* court noted the following about the § 547(c)(1) defense:

> When evaluating a new value defense, the key question is whether the alleged preferential transfer diminished the debtor's estate, i.e., whether the debtor in fact acquired a new asset that offset the loss and value to the estate when the debtor transferred existing assets to acquire the new asset at issue.

709 F.3d at 398 (citation omitted).

**Tenth Circuit:**

The holdings in the *Kenan* and *Spears* cases relied upon by Defendants, are no longer good law in the Tenth Circuit, because of two later Tenth Circuit cases, *Lowrey v. U.P.G., Inc.* (*In re Robinson Bros. Drilling, Inc.*), 877 F.2d 32 (10th Cir. 1989) and *Elec. Metal Prods., Inc. v. Bittman* (*In re Elec. Metal Prods., Inc.*), 916 F.2d 1502 (10th Cir. 1990).

• In *Lowery*, the Tenth Circuit interpreted its earlier decision in *Kenan* (also known as *In re George Rodman, Inc.*) in such a way as to overrule *Kenan*, without explicitly saying so.

First, the *Lowery* court interpreted *Kenan* to mean only that a creditor who gives value to the debtor *equivalent to the full amount of the transfer* received from the debtor has a complete defense under § 547(c)(1):

> Although not explicitly stated in the opinion, it is elementary that the creditor in *In re George Rodman, Inc.* was entitled to the § 547(c)(1) defense because it released a lien **equivalent to the full amount of the transfer by the debtor**. Thus, the estate was not diminished by the transfer **because the creditor was secured by a valid lien to the full extent of transfer by the debtor**, and the goals of the § 547(c)(1) defense were met.

877 F.2d at 33-34 (emphasis added).

Second, the *Lowery* court quoted the *Jet Florida* case with approval, including the propositions that: (1) "'a party seeking the shelter of section 547(c)(1) must prove the

specific measure of the new value given to the debtor in the exchange[;]'" and (2) that this section "'protects transfers only "to the extent" the transfer was a contemporaneous exchange for new value. A court must measure the new value given to the creditor and the new value given to the debtor in determining the extent to which the trustee may void a contemporaneous exchange[;]'" and (3) "the Bankruptcy Code's definition of the term 'new value' implies that the creditor must prove the specific valuation in 'money or money's worth in goods, services or new credit.'" *Id.* at 34 (quoting *Jet Florida*).

• In *Electronic Metal Products, Inc.*, the Tenth Circuit quoted *Lowery* with approval, which case cited *Jet Florida*, and held that the § 547(c)(1) defense requires the creditor to prove "'the specific valuation'" of the alleged new value it gave to the debtor. *See* 916 F.2d at 1506.

In addition to the courts of appeal in the six circuits listed above (including the Tenth Circuit) that have rejected Defendants' position, lower courts also have done so, including a bankruptcy court case within the Sixth Circuit. *See McLemore v. Third Nat'l Bank in Nashville* (*In re Montgomery*), 123 B.R. 801, 812 (Bankr. M.D. Tenn. 1981) (citations omitted) ("The party asserting the § 547(c)(1) defense must prove the specific measure of the new value given to the debtor in 'money or money's worth in goods, services, or new credit . . . .'"); *see also Simon v. Engineered Prot. Sys., Inc.* (*In re Hatfield Electric Co.*), 91 B.R. 782, 784 (Bankr. N.D. Ohio 1988) (citations omitted) ("[The] [c]ontemporaneous exchange exception in Section 547(c)(1) is premised, inter alia, on the presumption that receipt of new value offsets the transfer and the estate is not depleted or diminished to the detriment of other creditors."); 5 Collier on Bankruptcy ¶ 547.04[1], at 547-44 (Richard Levin & Henry J. Sommer, eds., 16th ed. 2017) ("Section 547(c)(1) protects transfers only to the extent of the new value given. Thus, if the

debtor transfers $50,000 to the creditor in exchange for the release of a lien on collateral worth $30,000, the difference of $20,000 is not protected from avoidance under the contemporaneous exchange exception.") (footnote omitted) (citations omitted).

The Court rejects Defendants' argument. The Court agrees with what now appears to be the unanimous view, as shown by the cases cited above, that a defendant asserting the contemporaneous new value defense under § 547(c)(1) must prove the amount of the value of any "new value" provided to the Debtor, and has no § 547(c)(1) defense beyond the amount of such value.

Defendants make two primary arguments in support of their view of § 547(c)(1), both of which have been rejected by cases cited above. First, Defendants focus on the difference between the wording of § 547(c)(1) and the wording of § 547(c)(4), and argue that the difference in wording shows a Congressional intent that the *amount* of new value be relevant under § 547(c)(4), but not be relevant under § 547(c)(1).

The difference in wording is in the placement of the phrase "to the extent that" in the two subsections. Section 547(c)(4) says in pertinent part that a transfer is not avoidable as a preference if the transfer is "to or for the benefit of a creditor, **to the extent that**, after such transfer, such creditor gave new value to or for the benefit of the debtor . . . ." 11 U.S.C. § 547(c)(4) (emphasis added).[22] Defendants agree that under this wording, the defense is

---

[22] The full text of § 547(c)(4) is this:

(c) The trustee may not avoid under this section a transfer—
. . .

(4) to or for the benefit of a creditor, **to the extent that**, after such transfer, **such creditor gave new value** to or for the benefit of the debtor—

available only to the extent of the *amount* of the subsequent new value given to the Debtor.  And Defendants agree that the purpose of § 547(c)(4) is, in effect, to credit a transferee who after the transfer gives unpaid-for new value to the debtor, because that transferee is considered to have replenished the bankruptcy estate to the extent of that new value given.  Given this purpose, the *amount* of the subsequent new value is a critical limit on the defense.

The phrase "to the extent that" also appears in § 547(c)(1), but in a somewhat different way than in § 547(c)(4).  Section 547(c)(1) says:

> (c) The trustee may not avoid under this section a transfer—
>
> > (1) **to the extent that** such transfer was—
> >
> > > (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
> > >
> > > (B) in fact a substantially contemporaneous exchange[.]

11 U.S.C. § 547(c)(1) (emphasis added).  Defendants argue that under this wording the defense is not limited "to the extent" of the new value given by the creditor — *i.e.*, to the amount of such new value given.  Rather, Defendants say that here, the phrase "to the extent that" only applies to (1) the parties *intent* that an exchange be contemporanous; and (2) the exchange *being in fact substantially contemporanous*.  According to Defendants, the phrase "to the extent that" does not apply to the "new value" given.

---

> (A) not secured by an otherwise unavoidable security interest; and
>
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

11 U.S.C. § 547(c)(4) (emphasis added).

34

The many cases cited and quoted above have rejected Defendants' interpretation of § 547(c)(1), and have held that the defense is limited to the amount of new value given to the debtor in exchange for a transfer. This Court agrees with those cases, and rejects Defendants' interpretation.

One reason why this Court does so is that the phrase "to the extent that" in the beginning of § 547(c)(1) clearly applies both to the phrase in § 547(c)(1)(A) and to the phrase in § 547(c)(1)(B). Because it applies to the latter, § 547(c)(1) clearly includes the element that a transfer is unavoidable only "to the extent that such transfer was . . . in fact a substantially contemporanous exhange." But the question then is, a "substantially contemporanous exchange" for what? The clearly implied answer is, "a substantially contemporanous exchange" for "new value given to the debtor" (the phrase used in § 547(c)(1)(A).) From this, the Court infers that the phrase "to the extent that" at the beginning of § 547(c)(1) combines with the rest of that section's wording to mean, among other things, that the defense applies only "to the extent that" the transfer was an exchange for new value given to the debtor. As a result, the Court concludes that the § 547(c)(1) defense, like the § 547(c)(4) defense, is limited to the *amount* of new value given to the debtor. And this clearly is the now-unanimous view taken by the cases summarized and quoted above.

Defendants second argument is that the legislative history of § 547(c)(1) supports their interpretation of the statute. Defendants argue that the history shows a Congressional intent to protect from preference avoidance transactions that were intended to be essentially simultaneous exchanges, but which in fact turned out to be only substantially contemporaneous exchanges. Defendants point out that with an actual simultaneous exchange, there is no credit extended, and

35

therefore there is no antecedent debt created that is paid by a transfer from the debtor. So with a simultaneous exchange, there is no preference avoidance possible, regardless of whether the exchange was one of equal or comparable value. Thus, for example, a sale of goods for cash paid by a debtor at the time of sale cannot be deemed a preferential transfer, even if the price paid by the debtor is much greater than the value of the goods received in exchange. Defendants argue that Congress intended the same result to occur for exchanges that were intended to be contemporaneous, but which turned out to be only in fact *substantially* contemporaneous. And, Defendants argue, this is so even if the debtor's transfer was greater in value than the value of what the debtor received in exchange.

The United States Court of Appeals for the Sixth Circuit discussed the legislative history of § 547(c)(1), which the court described as "sparse," in *Ray v. Sec. Mut. Fin. Corp.* (*In re Arnett*), 731 F.2d 358, 361 (6th Cir. 1984):

> The legislative history of section 547(c)(l) is sparse. The Comment to the section provides in its entirety as follows:
>
> > The first exception [§ 547(c)(l)] is for a transfer that was intended by all parties to be a contemporaneous exchange for new value, and was in fact substantially contemporaneous. Normally, a check is a credit transaction. However, for the purposes of this paragraph, a transfer involving a check is considered to be "intended to be contemporaneous," and if the check is presented for payment in the normal course of affairs, which the Uniform Commercial Code specifies as 30 days, U.C.C. § 3-503(2)(a), that will amount to a transfer that is "in fact substantially contemporaneous."
>
> H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977) [hereinafter cited as H.R. 595], U.S.Code Cong. & Admin. News 1978, pp. 5787, 6329.

In enacting the "contemporaneous exchange" exception, Congress intended to codify decisions under the old bankruptcy act which had held that, when a cash sale was intended, acceptance of a check instead of cash did not change the character of the transaction, so long as the check was cashed within a reasonable period of time. *See, e.g., Engstrom v. Wiley*, 191 F.2d 684 (9th Cir. 1951); *Engelkes v. Farmers Co-operative Co.*, 194 F. Supp. 319 (N.D. Iowa 1961). Some have stated that the provision also codified *Dean v. Davis*, 242 U.S. 438, 37 S. Ct. 130, 61 L. Ed. 419 (1917), which held that there was no preference where a loan was intended by both parties to be a secured loan even though the mortgage was not actually executed until seven days after the loan was made. *See, e.g., In re Advance Glove Mfg. Co.*, 25 B.R. 521 (Bkrtcy. E.D. Mich.1982); *In re Martella*, 22 B.R. 649 (Bkrtcy. D. Colo.1982). Whether *Dean v. Davis* survived passage of the Bankruptcy Reform Act of 1978, and was codified into section 547(c)(1) has been questioned, however. *In re Murray*, 27 B.R. 445 (Bkrtcy. M.D. Tenn.1983).

Nonetheless, it is clear that the classic exception to avoidance intended by Congress to be reflected in section 547(c)(l) is the exchange of goods or other "value" for a check. Such transactions are generally intended to be cash transactions, although some extension of credit is necessarily involved until the check is negotiated.

As Richard Levin, a member of the House Judiciary Committee staff during the drafting of the Bankruptcy Reform Act of 1978, notes, Congress was concerned that these essentially cash transactions not be converted to credit transactions because of delay in depositing the checks intended as cash payments:

> . . . The first exception [the contemporaneous exchange exception] is a simple one, excepting a transfer that is really not on account of an antecedent debt. No doubt a purchase by the debtor of goods or services with a check, if deemed to be on credit by state law, would be insulated by this exception. Though strictly speaking the transaction may be a credit transaction because the seller does not receive payment until the check is cleared through the debtor's bank, it is generally considered and intended to be a contemporaneous transaction, and assuming the check is promptly deposited and

cleared, is in fact substantially contemporaneous.

> "An Introduction to the Trustee's Avoiding Powers," 53 Am.
> Bankr. L.J. 173, 186 (Spring 1979).

The Court finds Defendants' legislative history argument to be unpersuasive.  First, the Court concludes that the language of § 547(c)(1) is unambiguous, and unambiguously means what the Court has held it means, above (supported by the now-unanimous view of the many cases cited above).  So resort to legislative history is not permitted.  *See, e.g., Barnhill v. Johnson*, 503 U.S. 393, 401 (1992) (citing *Toibb v. Radloff*, 501 U.S. 157, 162 (1991)) ("[A]ppeals to statutory history are well taken only to resolve 'statutory ambiguity.'"); *Olden v. LaFarge Corp.*, 383 F.3d 495, 502 (6th Cir. 2004) (citations omitted) ("Rules of statutory construction teach that generally a court cannot consider the legislative history of a statute in interpreting its meaning unless the statute is ambiguous.").

Second, the most that can be gleaned from the "sparse" legislative history of § 547(c)(1) is that Congress intended to treat a sale paid for by check the same as a sale paid for by cash, if the check is cashed within a reasonable time.  In that limited situation, at least, the legislative history shows only an intention that courts overlook the fact that a sale paid for by check is technically a credit transaction.  That does not address the issue now before the Court.

Third, many court of appeals cases, including at least one decision of the Sixth Circuit, have held that one of the purposes of § 547(c)(1) is to give credit for new value that replenishes the debtor's estate.  This purpose is served only *to the extent of the amount* of the new value given to the debtor.  *See, e.g.*, *Stevenson v. Leisure Guide of Am., Inc.*, (*In re Shelton Harrison Chevrolet, Inc.*), 202 F.3d 834, 837 (6th Cir. 2000) (citation omitted) ("The purpose of the contemporaneous exchange exception is to 'encourage creditors to continue doing business with

38

troubled debtors who may then be able to avoid bankruptcy altogether.' In addition, this exception recognizes that the debtor's payment does not adversely affect other creditors because the payment is offset by the debtor's receipt of new value."); *Southmark Corp. v. Schulte Roth & Zabel* (*In re Southmark Corp.*), 239 F.3d 365, No. 99-11401, 2000 WL1741550, at *3 n.1 (5th Cir. 2000) (quoting *Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc.* (*In re Fuel Oil Supply & Terminaling, Inc.*), 837 F.2d 224, 228 (5th Cir. 1988)) ("[T]he defense under § 547(c)(1) "'is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of other creditors.'"); *Campbell v. The Hanover Ins. Co.*, 709 F.3d at 398 (citation omitted) (noting, about § 547(c)(1), that "[w]hen evaluating a new value defense, the key question is whether the alleged preferential transfer diminished the debtor's estate, i.e., whether the debtor in fact acquired a new asset that offset the loss in value to the estate when the debtor transferred existing assets to acquire the new asset at issue."); *see also Simon v. Engineered Prot. Sys., Inc.,* 91 B.R. at 784 (citations omitted) ("[The] [c]ontemporaneous exchange exception in Section 547(c)(1) is premised, inter alia, on the presumption that receipt of new value offsets the transfer and the estate is not depleted or diminished to the detriment of other creditors.")

For all of these reasons, the Court holds that under § 547(c)(1), Defendants must prove the amount of the value of any "new value" provided to the Debtor, and have no § 547(c)(1) defense beyond the amount of such value.

**(d) Defendants' argument that the value of their services is presumed to equal the amount of their payments under the Consulting Agreements**

In support of both of their new value defenses, under both § 547(c)(1) and § 547(c)(4), Defendants argue that there is a presumption that the value of the services they provided under

39

the Consulting Agreements is the amount the Debtor agreed to pay them for such services, in the Consulting Agreements. Defendants further argue that the Trustee has not rebutted that presumption.

In their trial brief, Defendants cited several cases in support of this argument:

> [T]here is a presumption that the amount of new value is the amounts provided for in the Consulting Agreements. In In Re: Jones Truck Line, Inc., 130 F.3d 323, 328 (8th Cir. 1997), the Court made it clear that: "Absent contrary evidence, the value of employee services is presumed to equal the wages and benefits the employer contracted to pay." Otherwise, as the Court stated: "It would not encourage employees to stick with a troubled business if their current wages and benefits could later be attacked as preferential on the ground that their labor was not worth what the employer agreed to pay." Id. See also, In Re: Nomus-North Carolina, Inc., 2004 Bankr. Lexis 2708, 2004 WL 574510 (Bankr. M.D. N.C. 2004) ("Members of the Loftus Group continued to provide services to the Debtor until it was clear that the Debtor could not reach an agreement with the bank. These services constituted new value. Value of an employee['s] services is presumed to equal wages and benefits that an employer contracted to pay."); In Re: Molten Metal Technology, Inc., 262 B.R. 172, 176 (Bankr. MA 2001) ("The Court agrees with both parties that the "value" advanced by Oppenheimer included Oppenheimer's services and success at procuring investors, and that, absent any set off for the redemption claims, the services should be valued at the contract rate...."); and In Re: NETtel Corporation, Inc., 319 B.R. 290, 295 (Bankr. D.C. 2004) ("Presumptively, the increase in value to the estate arising from a subsequent performance of services will be measured by the contract price of the services.").[23]

The Court concludes that in this case, there is no presumption that the payments the Debtor agreed to make to Defendants under the Consulting Agreements equal the value of the services Defendants provided under those agreements. Rather, Defendants bear the burden of proving the value of their services without the aid of any presumption.

------------------------------------

[23] [Defs.'] Trial Br. (Docket # 76 in Adv. No. 13-5094; Docket # 72 in Adv. No. 13-5095) at 17-18 (footnote omitted).

First, there is no Sixth Circuit authority supporting such a presumption.

Second, there is no language in § 547 or anywhere else in the Bankruptcy Code that supports such a presumption.

Third, in the case of transfers to an insider of the bankruptcy debtor, at least, it does not make sense to recognize such a presumption. Rather, it makes sense to hold, as this Court now does, that the contract price agreed to by a debtor for the services of an insider is, **at most**, merely one piece of relevant evidence of the value of the services. The contract price does not raise a presumption of the value, but rather, **at most**, it is merely some evidence of the value of the services, to be considered along with all other relevant evidence on the subject, and to be given whatever weight the trier of fact finds appropriate under all the circumstances.

Fourth, all of the cases Defendants cite in support of the alleged presumption are distinguishable from the case of insiders like Defendants Ross and Karafa. The Court agrees with the following arguments made by the Trustee, in distinguishing three of the four cases cited by Defendants:

> (a) *In re Jones Truck Lines*, *supra*, involved a preference suit to recover contributions made to the Central States Pension Fund. The payment was made in exchange for continued services performed by approximately 2,300 unionized laborers. . . . Further, the sole authority on which the *Jones Truck Lines* Court relies for the statement is *In re Pulaski Highway Exp., Inc.*, 57 B.R. 502, 510 (Bankr. M.D. Tenn., 1986). However, *Pulaski* does not define such a general presumption, but rather states, without citation to authority, "In the absence of evidence to the contrary, I find that the reasonable value of the services rendered to [the] estate equals the amount specified in the collective bargaining agreement." The facts of *Jones Truck Lines* and *Pulaski* are very different from the facts of the present adversary proceedings. Indeed, *Pulaski* wasn't even a preference case but, rather, addressed whether a multiemployer pension plan's withdrawal liability claim is entitled to administrative expense priority. **More importantly, both of**

41

these cases addressed unionized laborers (not insiders who had controlled the Debtor for nearly two decades), operating businesses (not a holding company with no substantial business operations) and complex, heavily negotiated contracts (unlike the Consulting Agreements which, Defendants acknowledge were not negotiated). *See* Affidavit of Michael J. Ross, **Trial Exhibit 26**, ¶ 14; Affidavit of Jeffrey Karafa, **Trial Exhibit 27**, ¶ 12 ("I did not participate in the drafting of the Consulting Agreement or negotiate the terms and provisions of the Consulting Agreement").

(b) *In re Molten Metal Technology, Inc.*, *supra*, . . . does not discuss any presumption . . .. In that case, the court simply agreed with both parties that the services should be valued at the contract rate. *Id*. at 176 ("The Court agrees with both parties that the "value" advanced by Oppenheimer included Oppenheimer's services and success in procuring investors for the Debtor, and that, absent any set off for the redemption claims, the services should be valued at the contract rate"). **Moreover, *Molten Metal* involved payments to an independent service provider, Oppenheimer & Co., which had provided financial advisory services to the debtor. Finally, as in *Jones Truck Lines*, and unlike in the present case, *Molten Metal* involved an operating company, not a holding company with no assets.** . . .

(c) *In re Nomus-North Carolina, Inc.*, *supra*, is not additional authority because it merely relies on *Jones Truck Lines* without analysis or explanation. Once again, *Nomus* has dramatically distinguishable facts. Unlike the present case, the preference defendant in *Nomus* was a non-insider crisis management firm that was retained to provide operational and financial consulting for a group of operating entities as a condition to forbearance by the debtor's secured creditor. There, it was undisputed that members of the crisis management firm were on the premises every day. Unlike the present case, the engagement letter for the crisis management firm was negotiated and set forth specific projects that the firm would perform.[24]

The fourth case relied on by Defendants, the *NETtel* case, likewise is distinguishable from

this case. In *NETtel*, the preference defendant was a not an insider. Rather, it was an outside

---

[24] [Trustee's] Mot. in Limine [etc.] (Docket # 72 in Adv. No. 13-5094; Docket # 68 in Adv. No. 13-5095) at 7-9 (emphasis added).

company that had sold certain computer equipment to the debtor, and which had a contract to provide the debtor with certain systems maintenance services and computer software licensing services. The defendant alleged that it provided the debtor with new value after receiving the debtor's allegedly preferential transfer. The new value was in the form of continued services under the contract, and the debtor's continued use of the licensed software under the contract. 319 B.R. at 293, 296. The court cited the *Jones Truck Lines* and *Molten Metal Technology* cases for the proposition that "[p]resumptively, the increase in value to the estate arising from a subsequent performance of services will be measured by the contract price of the services." *Id.* at 295 (footnote omitted). As with the other cases cited by Defendants, *NETtel* is quite different from this case, in that: (1) *NETtel* did not involve a services contract between the debtor and its long-time insiders; (2) *NETtel* did involve a debtor that was continuing to operate its business; and (3) *NETtel* did not involve services to help wind down a debtor that no longer had any business, and that was preparing to file a Chapter 7 bankruptcy case.

Transactions between debtors and insiders are different than arms-length transactions, and must be viewed with closer scrutiny. *Schubert v. Lucent Techs. Inc.* (*In re Winstar Commc'ns Inc.*), 554 F.3d 382 (3d Cir. 2009) (quoting the legislative history of 11 U.S.C. § 101(31) (defining "insider") (S.Rep. No. 95-989, at 25 (1978) as reprinted in 1978 U.S.C.C.A.N. 5787, 5810) ("'An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at [arm's] length with the debtor.'"); *Anstine v. Carl Zeiss Meditec AG* (*In re U.S. Med., Inc.*), 531 F.3d 1272, 1279-80 (10th Cir. 2008) (citations omitted) (stating "that the insiders explicitly listed in 11 U.S.C. § 101(31) give rise to a 'conclusive presumption' that they have ['"a sufficiently close

43

relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms [sic] length with the debtor'"]); *Browning Interests v. Allison* (*In re Holloway*), 955 F.2d 1008, 1010-11 (5th Cir. 1992) (citing 2 Collier on Bankruptcy ¶ 101.31 at 101-87 (15th ed. 1991) and the legislative history of 11 U.S.C. § 101(31)) (stating that "'[a]n "insider" generally is an entity whose close relationship with the debtor subjects any transactions made between the debtor and such entity to heavy scrutiny'" and that "an insider . . . [is] a person or entity with 'a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor'"); *Miller v. Schuman* (*In re Schuman*), 81 B.R. 583 (B.A.P. 9th Cir. 1987) (relying on the legislative history of 11 U.S.C. § 101(31) to hold that transactions between debtors and insiders are to be more closely scrutinized than transactions conducted at arms length); *Editorial Flash, Inc. v. Olavarria (In re Editorial Flash, Inc.)*, No. 14-00224 BKT, 2016 WL 3638471 (Bankr. D.P.R. June 29, 2016) (internal quotation marks and citations omitted) (holding, and citing cases that held, that for purposes of 11 U.S.C. § 547(b)(4)(B), transactions between an insider and a transferee who is an insider, must be carefully scrutinized because an insider "as a matter of fact, . . . exercises such control or influence over the debtor as to render their transactions not arm's length").

The Trustee cites *Official Comm. of Unsecured Creditors of Enron Corp. v. Whalen* (*In re Enron Corp.*), 357 B.R. 32, 50 (Bankr. S.D.N.Y. 2006) in support of his position. In *Enron*, the preference defendant was the executrix of the estate of a deceased former corporate insider, and asserted a defense under § 547(c)(4), based on services the decedent provided to the debtor under a consulting agreement, for which he was not fully paid. The defendant argued that the monthly payments due under the consulting agreement established the amount of the value the

decedent provided. The bankruptcy court denied summary judgment, however, finding that a

genuine issue of material fact existed regarding the value of the decedent's services. While the

court agreed that in general, a presumption exists that the value of services equals the contract

price, it held that any such presumption was rebutted in that case. *Enron* distinguishes the case

of an insider contract from a debtor's arms-length contract with an unrelated third party. As

such, *Enron* supports the Court's holding in the present cases:

> [Defendant] argues that the contractual terms are sufficient to
> establish the amount of "new value" [Defendant's decedent]
> provided to Enron. [Defendant] cites to a number of decisions
> holding that employees are presumed to have provided services
> equal to their wages for purposes of section 547(c)(4). *See Jones
> Truck Lines, Inc. v. Central States, Southeast and Southwest Areas
> Pension Fund* (*In re Jones Truck Lines, Inc.*), 130 F.3d 323, 328
> (8th Cir.1997) ("the value of employee services is presumed to
> equal the wages and benefit the employer contracted to pay").
> [Defendant] contends that the Committee has not introduced
> evidence sufficient to overcome that presumption.
>
> The Court concludes that a genuine issue of material fact exists and
> that [Defendant] therefore is not entitled to summary judgment on
> this matter. While the Court agrees that contractually-agreed upon
> payments can generally be presumed to equal the value of the
> services (or goods) provided, sufficient facts here exist to rebut that
> presumption. As the Committee notes, **[Defendant's decedent]
> was a member of Enron's senior management just prior to
> signing the Consulting Agreement**; this is not slander, as
> [Defendant] protests, but simply a recognition that the Consulting
> Agreement was signed on the same day that [Defendant's
> decedent] resigned as Vice Chairman and Chief Strategic Officer.
> Moreover, the Court notes that [Defendant's decedent's] monthly
> fees under the Consulting Agreement were nearly six times his
> monthly wages under the Employment Agreement. **In contrast,
> the employees in *Jones Truck Lines* were unionized laborers,
> subject to a collective bargaining agreement, while cases like
> *Gonzales v. Nabisco (In re Furr's Supermarkets, Inc.)*,** 317 B.R.
> 423, 432 (10th Cir. BAP 2004), also cited by [Defendant], **concern
> trade contracts for the sale of goods and commodities. In
> neither of the latter circumstances is there cause to discount**

> the results of arms' length negotiation between parties with
> diverging interests.  **In light of the facts, the same simply
> cannot be said here.**  Though neither consideration is sufficient to
> establish that [Defendant's decedent] provided less new value than
> [Defendant] asserts, both together, as well as other considerations
> flowing from the totality of the circumstances, are sufficient to
> overcome the presumption that the contractual payments equaled
> the new value provided.

357 B.R. at 50 (emphasis added).

For these reasons, the Court rejects Defendants' presumption argument, and holds that

there is no presumption that the value of Defendants' services equals the price the Debtor agreed

to pay Defendants in the Consulting Agreements.

In their trial brief, the Defendants make a further argument about the rebuttable

presumption discussed above.  They argue that the value of their services under the Consulting

Agreements cannot be deemed to be *less than* the contract price the Debtor agreed to pay, *unless*

*the Trustee successfully avoids the Debtor's obligation to pay under the Consulting Agreement*

*as a fraudulent obligation*.  (And that is something the Trustee did not seek to do in these cases.)

Defendants argued this:

> In the NETtel case, the court queried as to whether the presumption
> can **only** be overcome **if** the contractual obligations were first set
> aside as fraudulent incurrences of obligations. See footnote 7 on
> page 295, wherein the court stated:
>
> > "For purposes of addressing the instant motion, the
> > court will assume in Harris's favor that to the extent
> > that Harris can demonstrate the contract price of the
> > services, it measures the value.  However, in some
> > cases an issue may exist whether the contract price
> > can be rejected under  § 547(a)(2) as the "money's
> > worth" of the services when the contract price is
> > excessive in the market, and whether, alternatively,
> > the excessive contract price can only be set aside
> > under 11 U.S.C. § 544 (which addresses avoiding

the incurring of an obligation via the trustee's
invocation of certain actual or hypothetical
creditors' rights under nonbankruptcy law) or 11
U.S.C. § 548(a)(1) (which addresses avoiding the
incurring of an obligation in exchange for less than
reasonably equivalent value)."

Such query should be answered in the affirmative . . . .  Again, the
valuation issue is relevant to a fraudulent transfer but not to a
preference.  **Litigating such issue in the context of a preference
is simply an inappropriate end run around the fact that
Trustee is not pursuing a fraudulent transfer action.**[25]

The Court rejects this argument, for the following reasons.  First, the *NETtel* case does

not support Defendants' argument, but rather merely raises it as a question, which the court did

not answer (and did not need to answer).  Second, Defendants have cited no case that supports

their argument.  Third, there is no provision in the Bankruptcy Code that supports Defendants'

argument.

Fourth, the argument, as articulated by Defendants, is premised on there being a

presumption — that contract price equals value of contract services.  But that premise is false in

a case like this one — this Court has held that no such presumption exists in an

insider–preference case like this one.

Fifth, avoidance of a transfer as a preference under Bankruptcy Code § 547 is a ground

for avoidance that is separate from, and in addition to, avoidance of a transfer as a fraudulent

transfer (or avoidance of an obligation as a fraudulent obligation) under Bankruptcy Code §§ 548

or 544 (using state fraudulent transfer law).

For all of the reasons stated above, Defendants bear the burden of proving the value of

---

[25] [Defs.'] Trial Br. (Docket # 76 in Adv. No. 13-5094; Docket # 72 in Adv. No. 13-5095) at 18
n.9 (emphasis in original).

their services, without the aid of any presumption, in order to succeed on their new-value

defenses under either §§ 547(c)(1) or 547(c)(4).

**(e)  Defendants failed to prove their § 547(c)(1) defense with respect to any of the transfers at issue.**

As shown in detail in the tables in Part IV.A.1 of this Opinion, Defendants Ross and

Karafa each received 32 weekly payments from the Debtor during the time period April 1, 2012

through November 10, 2012.  Each of these 64 payments was a separate transfer.

The Court concludes that each of the Defendants failed to meet his burden of proving, by

a preponderance of the evidence, any of the necessary elements to establish a defense under

§ 547(c)(1) with respect to any of the transfers.

**1.  Defendants did not prove the intent element of § 547(c)(1)(A).**

First, Defendants each failed to prove that any of the transfers were intended by both the

Debtor and the Defendant "to be a contemporaneous exchange for new value given to the

debtor," as required by § 547(c)(1)(A).  Each Defendant had to prove that both he and the Debtor

had such intent.  *See* discussion in Part IV.A.4(a) of this Opinion.  At trial, Defendants presented

no admissible evidence that the bankruptcy Debtor (Dearborn Bancorp., Inc.) had any such

intent.  And the Court finds that neither the Debtor nor the Defendants had any such intent.

Defendants argue that such intent is shown by the terms of the Consulting Agreement that

each of them signed with the Debtor.  The Court disagrees, however, and finds that the

Consulting Agreements show just the opposite.

The Ross Consulting Agreement was identical to the Karafa Consulting Agreement,

except for some particular details unique to each Defendant, such as the Defendant's title, duties,

and the amount of payments to be made to the Defendant.  The Ross Consulting Agreement (PX-

48

3) stated that it was effective as of March 31, 2012; that the term of the agreement was one year, commencing March 31, 2012; and that during the term of the agreement Ross would serve as the "President and Chief Executive Officer" of the Debtor. The Ross Consulting Agreement stated the following with respect to Ross's duties:

> Consultant will be expected to perform such duties and responsibilities as are commensurate with the position of President and Chief Executive Officer and as are necessary and appropriate for the management and winding up of the business and affairs of the [Debtor].[26]

The agreement further stated that Ross's relationship with the Debtor "is that of an independent contractor and not an employee." In a section called "Time Devoted," the agreement stated:

> Consultant shall be expected to devote such time to [the Debtor] as necessary to perform his duties and responsibilities hereunder. Nothing stated herein shall require him to work full time for [the Debtor] or shall preclude him from engaging in any other business ventures provided they do not interfere with his responsibilities hereunder.[27]

The agreement contained an integration clause that stated:

> This Agreement contains the entire understanding between the parties hereto with respect to the subject matter hereof and supercedes any prior understandings, agreements, or representations, written or oral, relating to the subject matter hereof.[28]

The Ross Consulting Agreement stated that "[t]hroughout the Term of this Agreement," the Debtor would pay compensation as follows:

---

[26] PX-3 at 1, § 1.02.

[27] *Id*. at 2, § 2.02.

[28] *Id*. at 3, § 8.

> Salary:
> $6,867.00 paid weekly in advance
>
> Allowance for health care benefits:
> $1,000.00 paid monthly on the first of each month
>
> Reimbursement of Expenses:
> $75.00 paid monthly on the first of each month[29]

The terms of the Karafa Consulting Agreement (PX-4) were identical to the Ross

Consulting Agreement in all respects described above, except Karafa's agreement defined his

position as the "Chief Financial Officer and Treasurer of [the Debtor]," and described Karafa's

duties as follows:

> Consultant will be expected to perform such duties and
> responsibilities as are commensurate with the position of Chief
> Financial Officer and Treasurer and as are necessary and
> appropriate for the management and winding up of the business
> and affairs of the [Debtor].[30]

And Karafa's compensation was less than Ross's. The Karafa Consulting Agreement

stated that "[t]hroughout the Term of this Agreement," the Debtor would pay Karafa

compensation as follows:

> Salary:
> $3,846.00 paid weekly in advance
>
> Allowance for health care benefits:
> $1,000.00 paid monthly on the first of each month
>
> Reimbursement of Expenses:
> $50.00 paid monthly on the first of each month[31]

---

[29] *Id*. at 2, § 3, Ex. 1.

[30] PX-4 at 1, §§ 1.01, 1.02.

[31] *Id*. at 2, § 3, Ex. 1.

Thus, the Consulting Agreements required each of the Defendants to be paid a regular weekly salary and regular benefits in the same specific amounts for each week and for each month, respectively, through payments made in advance, at regular weekly intervals. In exchange for those payments by the Debtor, however, the Consulting Agreements did not require either Defendant to perform any particular services at any particular time, let alone at any regular weekly or monthly intervals. In fact, with respect to any given week's payment by the Debtor, the Consulting Agreements permitted the Defendants to perform no services at all during that week. The Consulting Agreements did not require the Defendants to work full time for the Debtor, and expressly allowed the Defendants to engage in other business ventures. The Consulting Agreements stated, vaguely, that each Defendant was an independent contractor, and only required each Defendant "to devote such time [to the Debtor] as necessary to perform his duties and responsibilities hereunder," which duties themselves were stated only vaguely.

It is clear from all of this that neither the Debtor nor the Defendants had any contractual intent under the Consulting Agreements that any of the weekly transfers by the Debtor be a *contemporaneous* exchange for any services to be given by the Defendants. To further illustrate the point, which applies to every transfer, consider the Debtor's check dated April 23, 2012 to Defendant Ross, in the amount of $6,867.00, listed in the table in Part IV.A.1 of this Opinion. According to Ross's invoice that was paid by that check, also dated April 23, 2012, that check was a salary payment for the week of April 22-28, 2012. Nothing in Ross's Consulting Agreement required Ross to perform any particular services for the Debtor during that week, or to perform any services at all during that week.

Thus, the unambiguous terms of the Consulting Agreements show a lack of any intent, by

51

the Debtor or by either of the Defendants, that any of the weekly transfers to Defendants be given in exchange for services provided at or near the same time as the transfer. Instead of services being given on a weekly basis contemporaneously with the Debtor's weekly transfers to Defendants, the Consulting Agreements provided only that Defendants give their services as and when such services were "necessary or appropriate for the management and winding up of business and affairs of [the Debtor]."

Defendants make much of the fact that the Consulting Agreements required Defendants' salaries to be paid "weekly in advance," and that their health care benefit allowance and expense reimbursements be "paid monthly on the first of each month." But this shows nothing at all — that is, it shows nothing about any intent that the Defendants' services be timed to coincide with the regular weekly or monthly payments from the Debtor. The only thing it shows is an intention about the timing of the Debtor's payments in relation to *the calendar.*

Thus, for example, the Debtor's first weekly salary payment to Defendants, for the first week after the March 31, 2012 effective date of the Consulting Agreements, was for the week of April 1-7, 2012, and was to be paid in advance of that week. And this is what was done — Karafa and Ross each received a check dated April 1, 2012 for the time period April 1-7 with respect to salary, and for the month of April 2012 with respect to the health care and expense reimbursement portions of their compensation. Yet the Consulting Agreements did not require either Defendant to perform any actual services for the Debtor during the week of April 1-7, 2012. And, in fact, the actual practice of the parties under the Consulting Agreements was that the amount and timing of each Defendant's services varied considerably during the weeks between April 1, 2012 and November 10, 2012, when the Debtor was making its regular weekly

52

and monthly payments.[32]

For these reasons, the Court finds that Defendants have failed to meet their burden of proving the first necessary element of their affirmative defense under § 547(c)(1) — that any of the transfers were "intended by the Debtor and the [Defendants] to be a contemporaneous exchange for new value [in the form of services] given [by Defendants] to the [D]ebtor."

   **2.  Defendants did not prove the "in fact . . . substantially contemporaneous" element of § 547(c)(1)(B).**

Defendants also failed to meet their burden of proving, by a preponderance of the evidence, with respect to any of the transfers, that the Debtor's transfer was "in fact a substantially contemporaneous exchange" for new value given to the Debtor in the form of services.

With respect to each of the 32 transfers to each Defendant, Defendants each failed to prove what services he performed during the week that the transfer related to, or at any other time temporarily proximate to the date of the transfer.  Nor did Defendants prove the amount of the value, if any, of any such temporarily proximate services.  Neither Defendant kept any time records for his work done under his Consulting Agreement,[33] and neither Defendant's invoices identified any services.[34]  At trial, each Defendant testified that he could not identify what services he performed during any given week under the Consulting Agreements.[35]

---

[32]  Each of the Defendants testified to this effect.  (*See* Tr. (Docket # 104) at 251-52 (Ross); Tr. (Docket # 105) at 47-48 (Ross) (some weeks were "very busy" and some weeks were "very slow"); 190-91 (Karafa)).

[33]  Tr. (Docket # 104) at 251 (Ross); Tr. (Docket # 105) at 195 (Karafa).

[34]  Copies of the invoices are in PX-2, DX-I-1, and DX-I-2.

[35]  *See* Tr. (Docket # 105) at 31-32 (Ross), 203 (Karafa).

Moreover, even if Defendants had proven that they performed specific services during any particular weeks when they were receiving the 32 weekly transfers from the Debtor, Defendants failed to meet their burden of proving that any such services provided any "value," in any amount, let alone any particular proven amount to the Debtor. (This point is further discussed in the next section of this Opinion, in connection with Defendants' § 547(c)(4) defense.)

For these reasons, the Court concludes that the Defendants failed to meet their burden of proving any of the necessary elements of their § 547(c)(1) defense, to any extent, as to any of the transfers at issue.

**5. Defendants' § 547(c)(4) defense (subsequent new value)**

**(a) Elements of the defense**

Defendants contend that a significant portion of the transfers are shielded from avoidance by § 547(c)(4), which states:

> (c) The trustee may not avoid under this section a transfer—
> . . .
>
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> (A) not secured by an otherwise unavoidable security interest; and
>
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]

11 U.S.C. § 547(c)(4).

For purposes of discussing Defendants' § 547(c)(4) defense, the Defendants' provision of

54

services to the Debtor can be broken into three time periods. First, Defendants claim that they provided services to the Debtor under their Consulting Agreements each week during the 32-week time period for which the Debtor made weekly payments to them (April 1, 2012 through November 10, 2012, the "Payment Period"). Second, Defendants also claim that they continued to provide services to the Debtor during the 17 weeks after that time period, when the Debtor no longer was paying them, until the Debtor filed its bankruptcy petition on March 11, 2013 (the "Non-Payment Period"). Third, Defendants also claim that they continued to provide services to the Debtor/bankruptcy estate after the bankruptcy petition was filed (the "Post-Petition Period").

Plaintiff argues, and Defendants do not dispute,[36] that any new value from services that Defendants provided during the Post-Petition Period does not count as new value under Defendants' § 547(c)(4) defense. That is correct, and many cases so hold. *See, e.g., Friedman's Liquidating Trust v. Roth Staffing Cos. LP* (*In re Friedman's Inc.*), 738 F.3d 547, 557 (3d Cir. 2013) (agreeing with the "vast majority of courts that have considered this issue" that "new value advanced after the petition date should not be considered in a creditor's [§ 547(c)(4)] new value defense") (citations omitted); *Phoenix Rest. Grp., Inc. v. Proficient Food Co.* (*In re Phoenix Rest. Grp., Inc.*), Nos. 301-12036, 303-0568A, 2004 WL 3113719 at *1, 9-10 (Bankr. M.D. Tenn. December 16, 2004), *aff'd* 373 B.R. 541 (M.D. Tenn. 2007) (citations omitted) (italics in original) (same) (reasoning, in part, that § 547(c)(4) requires that the new value be given "to or for the benefit of the debtor;" and post-petition advances of goods or services "are given to the

---

[36] In their post-trial brief, for example, Defendants argue their § 547(c)(4) defense based only on the new value their *pre-petition* services provided. (*See* Post Trial Br. of Defs., etc. (Docket # 96 in Adv. No. 13-5094, Docket # 90 in Adv. No. 13-5095) at 16) (footnote omitted) (arguing that "Defendants should be found to have valid defenses under §547(c)(4), since Defendants provided Debtor with new value, i.e., weekly services for 17 weeks prepetition, after Debtor ceased paying them for services on November 2, 2012.").

debtor's *estate*, not to the debtor"); *TennOhio Trans. Co. v. Felco Commercial Servs.* (*In re TennOhio Transp. Co.*), 255 B.R. 307, 310 (Bankr. S.D. Ohio 2000) (same); *NETtel Corp.*, 319 B.R. at 300 n.20 (citation omitted) ("[Section] 547(c)(4) is limited to new value imparted prior to the petition because the estate and the debtor are distinct entities.").

The relevant time periods, therefore, are the Payment Period and the Non-Payment Period. That is, the relevant time period begins immediately after the date of the Debtor's first transfers to each of the Defendants (April 1, 2012) and ends with the bankruptcy petition date (March 11, 2013). The 32 weeks of the Payment Period are relevant, even though the Debtor was making weekly payments to Defendants all through that period, because none of those transfers are "otherwise unavoidable" within the meaning of § 547(c)(4)(B). That is so because all of those transfers *are* avoidable, except to the extent § 547(c)(4) shields them. Because the Court has rejected Defendants' defenses under §§ 547(c)(1) and 547(c)(2), Defendants have no other defenses to avoidance left for any of the transfers, except § 547(c)(4). So for any given transfer to one of the Defendants, none of the transfers made to that Defendant thereafter can be deemed an "otherwise unavoidable transfer" that paid for any subsequent new value. *See, e.g, Jones Truck Lines, Inc.*, 130 F.3d at 329 (Under § 547(c)(4), "subsequent new value cannot be offset or nullified by payments that are themselves avoidable preferences."); *Phoenix Rest. Grp., Inc. v. Proficient Food Co.*, 2004 WL 3113719, at * 8 (Under § 547(c)(4), "[a] payment by the debtor to the creditor after the creditor gave new value does not unravel the defense if the payment can itself be recovered as an avoidable transfer.").

**(b) Defendants failed to prove their § 547(c)(4) defense to any extent, with respect to any of the transfers at issue.**

During and for the 32 weeks of the Payment Period (April 1, 2012 to November 10,

2012), the Debtor paid Defendants a total of $358,766 for their services under the Consulting Agreements ($228,344.00 to Ross and $130,422.00 to Karafa). At some times during that same 32-week period, and then during the 17 weeks of the Non-Payment period, Defendants each performed some services under their Consulting Agreement. The question is: how much, if anything, in "new value" — *i.e.*, in "money's worth," meaning economic value — did each Defendant's pre-petition services give to the Debtor?

Defendants each had the burden of proving the answer to this question, by a preponderance of the evidence, in order to succeed on their § 547(c)(4) defense. Not only that, but also each Defendant had the burden of proving the timing element of their defense.[37] In this case, the Debtor made a total of 64 transfers (32 transfers to each Defendant). To have a defense to the avoidance of any given transfer to a Defendant, that Defendant had to prove that he performed services for the Debtor *after* the date of that transfer (and *before* the bankruptcy petition date), which provided "new value" to the Debtor, and the *amount of the value* of such new value. If the Defendant proved all these things, he would have a defense to avoidance of the transfer at issue, to the extent of the amount of the value of such new value.

---

[37] One point of law about timing concerns the precise dates on which the Debtor is deemed to have made the transfers at issue to Defendants. As noted in Part IV.A.1 of this Opinion, under the Supreme Court's decision in *Barnhill v. Johnson*, when a debtor makes a transfer by check, the transfer is deemed to have been made, for purposes of § 547(b), when the debtor's bank honored the check, rather than when the check was delivered to the transferee. But for purposes of the § 547(c)(4) subsequent new value defense, a transfer done by check is deemed to have been made when the check was delivered to the transferee. *See Brown v. Shell Canada, Ltd.* (*In re Tenn. Chem. Co.*)*,* 112 F.3d 234, 238 (6th Cir. 1997).

This timing difference does not matter in this case. It does not matter whether the Debtor's transfers to Defendants are deemed to have been made when the checks were delivered to Defendants, or when the checks were honored. In either event, the Court's findings about Defendants' failure to meet their burden of proof under § 547(c)(1) and under § 547(c)(4) are the same as those expressed in this Opinion.

As the Court has discussed earlier in this Opinion, to show that any of their services provided "new value" to the Debtor, Defendants had to prove that the services gave "a direct or indirect economic benefit to the [D]ebtor viewed from the perspective of the [D]ebtor's creditors." This means that the services "did any of the following: [(1)] brought in money to the [D]ebtor or the [D]ebtor's bankruptcy estate; . . . [(2)] saved the [D]ebtor or the bankruptcy estate expense; or [(3)] reduced or eliminated or avoided liability for, or [reduced] liability for the [D]ebtor []or the bankruptcy estate."[38]

And Defendants had to prove the *amount of the value* of such "new value" their services gave to the Debtor, with specificity. In this regard, the Court finds applicable the holdings of several of the court of appeals cases quoted earlier in this Opinion, in the context of discussing § 547(c)(1).[39] As those cases state, Defendants had the burden of proving "the specific measure" of the new value they gave to the Debtor (per the *Jet Florida*, *Southmark Corp.*, and *Campbell* cases); or, in other words, the "specific valuation" of the new value (per the *Electronic Metal Products* case); or, in other words, to prove the amount of such new value "with specificity" (per the *Arrow Air, Inc.* and *Campbell* cases).

The Court finds that Defendants did not meet their burden of proof, to any extent, with respect to any of the 64 transfers that Defendants received. This is especially so under the specificity requirement just described, but is is so even without applying the specificity requirement.

In rejecting Defendants' presumption argument, in Part IV.A.4(d) of this Opinion, this

---

[38] *See* Part IV.A.4(b) of this Opinion (quoting from the Court's summary judgment bench opinion).

[39] *See* Part IV.A.4(c) of this Opinion.

58

Court held that the contract price that the Debtor agreed to pay Defendants for their services under the Consulting Agreements *may be* relevant evidence of the value of Defendants' services. As the Court held, earlier in this Opinion:

> [T]he contract price agreed to by a debtor for the services of an insider is, **at most**, merely one piece of relevant evidence of the value of the services. The contract price does not raise a presumption of the value, but rather, **at most**, it is merely some evidence of the value of the services, to be considered along with all other relevant evidence on the subject, and to be given whatever weight the trier of fact finds appropriate under all the circumstances.[40]

In this case, the Court gives no weight to the contract price in the Consulting Agreements. There was no evidence that the Debtor agreed to pay Defendants the salary and benefit amounts that it did because of any view that the amounts represented the fair market value of the services to be provided. Rather, the salary amounts in the Consulting Agreements were simply *identical* to the salary amounts that Defendants had been receiving before the FDIC took over the Debtor's bank. Those salaries were paid to Defendants at a time when the Defendants were running an operating bank with $750-800 million in deposits, 15 branches, about 220 employees, and over 18,000 customers.[41] As soon as the FDIC took over the bank, the employees were terminated and the bank had no business to operate.[42] Defendants' services during the time they running an operating bank were quite different in nature from Defendants' wind-down services under the Consulting Agreements, which were performed for a Debtor that no longer had any business or employees, and that was about to file for Chapter 7 bankruptcy liquidation. There was no

---

[40] Part IV.A.4(d) of this Opinion (emphasis in original).

[41] *See* Tr. (Docket # 104) at 194, 241-43 (Ross).

[42] *See id.* at 243 (Ross); Tr. (Docket # 105) at 194-95 (Ross).

evidence presented at trial that in fact, or even just in the view of the Debtor, the fair market value of Defendants' wind-down services was at all comparable to the fair market value of Defendants' services when they were running the Debtor's bank as an operating business.

Nor did Defendants present any other evidence of the actual value to the Debtor that their services provided under the Consulting Agreements. Defendants testified at trial to their own views that their services provided actual value to the Debtor, but the Court finds that testimony unpersuasive, and the Court also finds that Defendants' testimony did not prove the amount of the economic value that their services gave to the Debtor.

In their post-trial brief, Defendants argued in detail what they contend the evidence at trial showed, about (1) the services they provided under the Consulting Agreements; and (2) the value of those services to the Debtor.

As to the what services the Defendants provided, Defendants argued as follows:

> Ross testified that he performed the following services for Debtor pursuant to his Consulting Agreement: communications with regulatory people, shareholders and directors, management of Debtors' legal team relating to FDIC issues and IRS tax issues, directed and communicated with professionals, met with Karafa and communicated with Karafa, spoke to the Chairman of the Board multiple times per week, and provided written correspondence no less than quarterly to the Board. Ross also testified that there were discussions with the Board not reduced to writing. Ross testified that the time Defendants expended working for Debtor pursuant to the Consulting Agreements fluctuated, and that Defendants performed services every week. Some weeks they were very busy, some weeks they were slow, and there were no weeks that Defendants did nothing for Debtor. Ross testified that he considered himself on call and available to Debtor "24/7." Ross also participated in discussions and reviews of pleadings relating to Debtor's bankruptcy filing.
>
> Ross also testified that he was very involved in resolving the problem of the FDIC freezing $7 million in 401K funds which

belonged to former employees of the Bank. Ross testified that he had numerous communications with former Bank employees because they had no access to their 401K funds and that this situation continued for in excess of 6 months, until Ross found an FDIC representative in Dallas, Texas, and "convinced them to do their job."

. . . .

Karafa testified that . . . he performed the following services to wind down Debtor's business: (1) winding down of [a] regulatory relationship with Federal Reserve Bank; (2) winding down of relationship with Securities Exchange Commission; (3) winding down of relationship with Computershare, Debtor's transfer agent; (4) ensuring that IRS and State of Michigan tax returns for 2011 and 2012 were prepared and finalized; (5) shutting down of Debtor's website; and (6) canceling insurance policies. Karafa also scanned, stored and maintained Debtor's books and records.

Karafa testified that he handled Debtor's checkbook, and reviewed and paid all invoices directed to Debtor, including Dickinson, Howard & Howard, Computershare, and S & L (Debtor's website). After the closing of the Bank, Karafa participated in discussions with Debtor's legal counsel relating to taking action against the State of Michigan and the FDIC relating to the wrongful takeover of the Bank. Karafa testified that . . . both Karafa and Ross engaged in conversations, emails and conferences with counsel.

. . .

Karafa testified that he assisted Debtor's accountants, BKD, relating to contesting the State of Michigan's business tax assessments. Karafa received all of the tax notices from the State of Michigan, communicated with Doug Born of BKD relating to the assessments and directed the actions of the accountants. [Footnote 19: Karafa testified that dealing with the State of Michigan tax issues was part of the services he rendered for Debtor pursuant to the Consulting Agreement, and that he generally received tax notices from the State on a monthly basis. . . .] Karafa also testified that he was Debtor's primary contact relating to IRS issues, and that he coordinated and attended meetings with the IRS, Ross and Dickinson.

. . . .

Karafa testified that as part of his duties to Debtor he discussed with counsel at Howard & Howard whether there was insurance

coverage for Debtor under Debtor's D&O policy.  Karafa also testified that he shut down Debtor's relationship with Computershare, its transfer agent, which eliminated a monthly liability.  Karafa also performed services relating to recovery of insurance premium refunds, and personally handled turnover to the FDIC of insurance premiums refunds which belonged to the Bank.

Karafa testified that he met with Ross in person or by phone weekly to discuss the business of Debtor.  During these conferences Ross and Karafa discussed what both of them had done during the last week, what had been resolved, what still needed to be done, invoices from outside vendors, and Debtor's general finances.  In addition, Ross and Karafa generally spoke every other business day.  Karafa was also principally in charge of assisting Dickinson with the preparation of Debtor's bankruptcy filings.  Karafa testified that although the Consulting Agreement did not require him to expend any set amount of time for Debtor, on average he spent 10-15 hours per  week working on Debtor's matters, some weeks more, and that there were no weeks where he didn't perform services for Debtor. . . .
. . . .

Ross testified that after Debtor ceased paying him for his services under the Consulting Agreement in November, 2012, he provided services to Debtor and expended substantial time relating to the IRS tax appeal.  Ross testified that pre-petition the IRS was asserting a claim against Debtor for in excess of $10 million.  Ross testified that he also assisted with the preparation of Debtor's bankruptcy filing (and that he and Karafa provided information to Trustee which assisted him in recovering retainers paid to professionals pre-petition).
. . . .

Karafa testified that he met with Ross and counsel at Dickinson to review the information required to prepare the bankrutpcy pleadings, and that he had the majority of the information needed to prepare the bankruptcy pleadings.  Karafa testified that he worked on gathering the information for the bankruptcy filing. Karafa also testified that Debtor did not immediately file for bankruptcy in November, 2012, because Dickinson advised that it would be best to wait for a final ruling on the IRS issues before moving forward with bankruptcy.  Karafa further testified that preparation of the bankruptcy schedules and pleadings was a work in process, not done all at one time, and that he received emails

62

from Dickinson requesting additional information.[43]

As to the actual *value* of these services to the Debtor, Defendants argued as follows in

their post-trial brief:

> Ross testified that . . . Defendants' services under the Consulting
> Agreements resulted in the following tangible benefits to Debtor:
> (1) recovery of insurance premium refunds in the gross amount of
> $52,811.55, with a net recovery for Debtor of $22,619.17; (2) no
> claims were filed in Debtor's bankruptcy case by either the FDIC
> or the IRS; and (3) [the] State of Michigan withdrew the claims it
> had filed in Debtor's bankruptcy case based upon Defendants' pre-
> petition efforts. [Footnote 16: The State of Michigan was listed
> with an unliquidated, disputed claim of over $405,000 in Debtor's
> Schedule F. See Trustee's Exhibit 14. The State of Michigan filed
> Claim 10-1 on 6/25/13 in the amount of $434.735.13; Claim 10-2
> on 10/4/13 in the amended amount of $582,245.73; Claim 10-3 on
> 6/16/14 in the amended amount of $212,768.45; Claim 10-4 on
> 12/17/14 in the amended amount of $21,338.32; and then on
> 12/19/14 filed a document (Docket No. 94) withdrawing all of its
> claims.]
> . . .
>
> Karafa testified that he provided value to Debtor through his
> services, including obtaining the insurance premium refunds,
> ending of service agreements and Debtor's website, elimination of
> the Michigan business tax claim, and providing information that
> resulted in the IRS not filing a claim in Debtor's bankruptcy case.
>
> Defendants also established that the services rendered by
> Defendants were needed by Debtor as, upon advice of counsel,
> Dickinson, Debtor needed to wrap up certain business matters,
> including outstanding tax issues, before filing for bankruptcy.
> Further, the services rendered by Defendants could not have been
> performed by just anyone. Both Ross and Karafa had significant
> banking experience and thorough familiarity with Debtor's
> business, making them uniquely qualified to do the work.
>
> [T]he services provided new value to Debtor, including, but not
> limited to, the orderly wind down of Debtor's business, recovery of

---

[43] Post Trial Br. of Defs. (Docket # 96 in Adv. No. 13-5094, Docket # 90 in Adv. No. 13-5095)
at 6-10, 15 (footnotes omitted) (record citations omitted).

> insurance premiums, reduction of operating expenses, and the
> reduction of claimed tax liabilities. Defendants' efforts resulted in
> the recovery of funds, resulted in no claim being filed by the IRS,
> and resulted in claims being withdrawn in the bankruptcy
> proceeding by the State of Michigan.[44]

The Court finds that Defendants failed to meet their burden of proving, by a preponderance of the evidence, either of the following: (1) that Defendants' services provided any economic value to the Debtor or the bankruptcy estate; and (2) in any event, *the amount* of any of the alleged economic value to the Debtor or the bankruptcy estate.

Furthermore, the Court agrees with Plaintiff's argument that Defendants failed to prove a causal link between any of their pre-petition services and the specific forms of economic benefit that Defendants allege. In this regard, the Court finds that Defendants failed to prove, by a preponderance of the evidence, that any of their pre-petition services actually caused, or contributed in a material way to causing, any of the following: (1) the Debtor's recovery of the insurance premium refunds ($30,192.38 of which went to the FDIC rather than the Debtor; $22,619.17 of which went to the Debtor); (2) the fact that neither the FDIC nor the IRS filed claims in the Debtor's bankruptcy case; or (3) the fact that the State of Michigan ultimately withdrew the claim it filed in the Debtor's bankruptcy case. Rather, the evidence showed that all of these things were caused by the efforts of persons other than the Defendants, including the FDIC and the Chapter 7 bankruptcy Trustee. The Court finds persuasive, and agrees with, the Plaintiff's detailed arguments to this effect, and the evidence cited by Plaintiff in support of those arguments.[45]

---

[44] *Id.* at 7-8, 11-12 (footnotes omitted) (record citations omitted).

[45] *See* Post Trial Br. of Plaintiff (Docket # 97 in Adv. No. 13-5094, Docket # 91 in Adv. No. 13-5095) at 11-18 and record citations therein.

64

The Court further finds that, contrary to Defendants' argument, Defendants did not prove with any persuasive evidence that, as Defendants allege in their post-trial brief quoted above, "the services rendered by Defendants were needed by Debtor as upon advice of counsel, Dickinson, Debtor needed to wrap up certain business matters, including outstanding tax issues, before filing for bankruptcy." There was no evidence presented at trial explaining or showing why the Debtor "needed to wrap up certain business matters, including outstanding tax issues, before filing for bankruptcy." And the accuracy of this assertion by Defendants is not apparent to the Court from the evidence presented at trial.

For all of these reasons, the Court concludes that the Defendants failed to meet their burden of proving any of the necessary elements of their § 547(c)(4) defense, to any extent, as to any of the transfers at issue.

All of the transfers at issue are avoidable as preferential transfers under 11 U.S.C. § 547, and the Court will enter a judgment in each adversary proceeding, avoiding the transfers.

## B.  Count V — recovery of avoided transfers under 11 U.S.C. § 550(a)(1)

### 1.  Judgment for the amount of the avoided transfers

11 U.S.C. § 550(a)(1) states, in pertinent part, and with exceptions not applicable here, that "to the extent that a transfer is avoided under section . . . 547 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from — (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]"

It is undisputed that Ross is "the initial transferee" of the $228,344.00 in transfers made by the Debtor to him, and that Karafa is "the initial transferee" of the $130,422.00 in transfers

made by the Debtor to him.  Under § 550(a)(1), then, Plaintiff is entitled to recover the amount of these avoided transfers made to Ross and Karafa.  As requested by Plaintiff, therefore, the Court will enter judgment against Ross in the amount of $228,344.00, and will enter judgment against Karafa in the amount of $130,422.00.

## 2. Prejudgment interest

In addition, the Plaintiff requests that the Court award prejudgment interest against Ross and Karafa.[46]  Plaintiff has not specified what interest rate he requests, or a requested date from which the interest should run.  And the parties have not briefed the issue of prejudgment interest.

In a prior case, this Court discussed the awarding of prejudgment interest in bankruptcy avoidance actions.  *Global Technovations, Inc. v. Onkyo U.S.A. Corp.* (*In re Global Technovations, Inc.*)*,* 431 B.R. 739, 774-76 (Bankr. E.D. Mich. 2010), *aff'd.*, No. 10-12781, 2011 WL 1297356 (E.D. Mich. Mar. 31, 2011), *aff'd. sub nom.*, *Onkyo Europe Elecs. GMBH v. Global Technovations, Inc.*, (*In re Gloval Technovations, Inc.*)*,* 694 F.3d 705 (6th Cir. 2012).  That case was a successful action by the liquidating agent in a Chapter 11 case to avoid a fraudulent transfer by the debtor, based on 11 U.S.C. § 544 and Florida's fraudulent transfer law.  In that case, this Court awarded prejudgment interest in favor of the Plaintiff.  It is true that the *Global Technovations* case was a fraudulent transfer avoidance action, and this case is an action to avoid preferential transfers.  But the Court's discussion of prejudgment interest in *Global Technovations* applies equally to this case, and the Court adopts it for this case.[47]  In *Global*

---

[46]  *See* Final Pretrial Order (Docket # 71 in Adv. No. 13-5094; Docket # 67 in Adv. No. 13-5095) at 15-16, ¶ 11; Compl. (Docket # 1 in Adv. No. 13-5094) at 8; First Amended Compl. (Docket # 6 in Adv. No. 13-5095) at 8.

[47]  The Court views its discussion and holdings about prejudgment interest in *Global Technovations* to be fully consistent with more recent cases decided after *Global Technovations*.  *E.g.*,

*Technovations*, the Court stated:

> It is well-settled that, unless prohibited by a statute, bankruptcy courts, as units of the district court under 28 U.S.C. § 151, have broad discretion in determining whether to award prejudgment interest based on the particular equities of a case. *See, e.g., Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616, 619 (6th Cir. 1998); *Bricklayers' Pension Trust Fund v. Taiariol*, 671 F.2d 988, 989-90 (6th Cir.1982); *Smith v. Am. Int'l. Life Assur. Co. of New York*, 50 F.3d 956, 958 (11th Cir. 1995).

> Although 28 U.S.C. § 1961(a) applies only to post-judgment interest, this statute does not prohibit an award of pre-judgment interest, and some federal courts have applied 28 U.S.C. § 1961(a) to determine the prejudgment interest rate, particularly where the Bankruptcy Code or other federal statutes supply the substantive right. *See, e.g., Sweet v. Consol. Aluminum Corp.*, 913 F.2d 268, 270-71 (6th Cir. 1990)(affirming the district court award of prejudgment interest under 28 U.S.C. § 1961(a) on a claim for pension benefits); *Lewis v. Harlin* (*In re Harlin*), 325 B.R. 184, 193 (Bankr. E.D. Mich. 2005)(stating that "[s]ome bankruptcy courts have exercised their equitable discretion to award prejudgment interest and set the prejudgment interest rate based on 28 U.S.C.A. § 1961(a)," and citing such cases); *Floyd v. Dunson, D/B/A MMD* (*In re Ramirez Rodriguez*), 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997)(holding that the trustee, who had successfully recovered preferential and fraudulent transfers, was "entitled to recover . . . prejudgment interest at the statutory rate set forth in 28 U.S.C. § 1961(a)," and citing other cases awarding prejudgment interest at the statutory rate set forth in 28 U.S.C. § 1961(a)); *Wilson v. First Nat'l Bank, Lubbock, Texas* (*In re Missionary Baptist Found. of Am., Inc.*), 69 B.R. 536, 538-39 (Bankr. N.D. Tex. 1987)(finding it logical for the bankruptcy court to apply the rate of interest in 28 U.S.C. § 1961 to both prejudgment and postjudgment interest where the Bankruptcy Code created the substantive right); *Waldschmidt, v. Ranier* (*In re Fulghum Constr. Corp.*), 78 B.R. 146, 153 (M.D. Tenn. 1987), *rev'd on other grounds*, 872 F.2d 739 (6th Cir. 1989)(finding that the bankruptcy court did not abuse its discretion in applying the rate of interest in 28 U.S.C. § 1961 to a preference action by the bankruptcy trustee).

> In determining whether prejudgment interest is appropriate, bankruptcy courts should inquire whether such an award would serve to compensate the prevailing party and is equitable under the circumstances. *See Frymire*

_____

*Meoli v. The Huntington Nat'l Bank*, 848 F.3d 716, 735-36 (6th Cir. 2017) (fraudulent transfer action; affirming bankruptcy court's award of prejudgment interest at the rate specified in 28 U.S.C. § 1961, finding that "it was not an abuse of discretion").

*v. Ampex Corp.*, 61 F.3d 757, 774 (10th Cir. 1995); *Floyd v. Dunson, D/B/A MMD* (*In re Ramirez Rodriguez*), 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997). A prejudgment interest award is appropriate where it is necessary to fully compensate a party for the lost use of its money and to prevent the defendant's unjust enrichment. *See Sweet v. Consolidated Aluminum Corp.*, 913 F.2d 268, 270-71 (6th Cir. 1990); *Vic Bernacchi & Sons, Inc. v. Loxas* (*In re Vic Bernacchi & Sons, Inc*), 170 B.R. 647, 656 (Bankr. N.D. Ind. 1994); *Fulghum Constr. Corp.*, 78 B.R. at 154.  In *Van Dyck/Columbia Printing v. Katz,* the court stated that

> "[T]he factors influencing the exercise of [the court's] discretion to [award prejudgment interest] include: (1) the need for full compensation of an injured party; (2) considerations of fairness and the relative equities of the award; (3) the remedial purpose of the statute involved, and/or (4) such other general principles as are deemed relevant by the court."

289 B.R. 304, 318 (D. Conn. 2003)(quoting *United States v. Nat'l Westminster Bank USA* (*In re Q-C Circuits Corp.*), 231 B.R. 506, 513-14 (E.D.N.Y. 1999)(citing *Wickham Contracting v. Local Union No. 3, IBEW*, 955 F.2d 831, 833 (2d Cir. 1992))).

Federal courts have exercised broad discretion in determining the time from which prejudgment interest should accrue.  "With respect to fraudulent transfers, some courts have awarded prejudgment interest beginning from the time that demand or an adversary proceeding is initiated, while others have awarded prejudgment interest from the date of the transfer." *LaSalle Nat'l Bank Ass'n v. Paloian*, 406 B.R. 299, 363 (N.D. Ill. 2009)(citation omitted).  However, generally, courts award prejudgment interest from the date a demand is made for the return of property or where no demand was made, from the date an adversary complaint was filed.  *Dayton Title Agency, Inc. v. White Family Cos., Inc.* (*In re Dayton Title Agency, Inc.*), 292 B.R. 857, 876 (Bankr. S.D. Ohio 2003)(citation omitted); *Floyd v. Dunson, D/B/A MMD* (*In re Ramirez Rodriguez*), 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997); *Pereira v. Goldberger* (*In re Stephen Douglas, LTD.*), 174 B.R. 16, 22 (Bankr. E.D.N.Y. 1994); *Waldschmidt, v. Ranier* (*In re Fulghum Constr. Corp.*), 78 B.R. 146, 153-54 (M.D. Tenn. 1987), *rev'd on other grounds*, 872 F.2d 739 (6th Cir. 1989).

431 B.R. at 774-76.

Applying the concepts discussed in *Global Technovations*, the Court finds that

prejudgment interest is necessary in this case: (1) to compensate the Debtor's bankruptcy estate for the lost use of the money that the Debtor transferred to the Defendants during the year preceding bankruptcy; and (2) to prevent the Defendants' unjust enrichment. The Court further finds that fairness, equity, and the remedial purposes of Bankruptcy Code §§ 547 and 550 all support an award of prejudgment interest.

The Court will award prejudgment interest to Plaintiff as follows: (1) from the date on which Plaintiff filed these adversary proceedings until the last post-trial brief was filed, at the federal statutory rate under 28 U.S.C. § 1961 that was in effect when the adversary proceedings were filed (the "Phase 1 rate"); and then (2) from that post-trial date until the date of judgment, at the federal statutory rate under 28 U.S.C. § 1961 that was in effect when the last post-trial brief was filed (the "Phase 2 rate").[48] The Court finds such rates to be fair interest rates — high enough to be properly compensatory but not so high as to be punitive. Post-judgment interest will accrue on the judgment at the federal statutory rate in effect as of the date of entry of judgment. 28 U.S.C. § 1961(a).

## C. Count VI — disallowance of Defendants' claims under 11 U.S.C. § 502(d)

Plaintiff seeks disallowance of the claims filed by Ross and Karafa in the Debtor's bankruptcy case, under 11 U.S.C. § 502(d). That section states:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer

---

[48] The Court finds that the Phase 1 rate is 0.13% per annum, and that the Phase 2 rate is 0.24 % per annum. *See Board of Governors of the Federal Reserve System* at https://www.federalreserve.gov/ datadownload/Choose.aspx?rel=H.15. Consistent with the way post-judgment interest is calculated, the prejudgment interest will be compounded annually. *See* 11 U.S.C. § 1961(b). Using these parameters, the Court calculates that the prejudgment interest to be awarded against Ross is $2,157.28, and against Karafa is $1,231.89.

avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(I), 542, 543, 550, or 553 of this title.

Under § 502(d), the proofs of claim filed by Ross and Karafa in the Debtor's bankruptcy case must be disallowed because, as the Court has concluded, each of these Defendants is an entity from which property is recoverable under 11 U.S.C. § 550 and is a transferee of transfers avoidable under 11 U.S.C. § 547. The Court will include in its judgment against each Defendant an order that the Defendant's claim is disallowed, unless and until that Defendant pays the full amount of the money judgment entered against him.

## V. Conclusion

For the reasons stated in this opinion, the Court will enter a judgment for the Plaintiff Trustee against each Defendant, granting the relief described above.

**Signed on April 20, 2018**



/s/ Thomas J. Tucker
**Thomas J. Tucker**
**United States Bankruptcy Judge**